ACTION ALLIANCE OF SENIOR CITI-
ZENS OF GREATER PHILADEL-
PHIA, et al., Appellants,

v.

Louis W. SULLIVAN, et al.

No. 87–5251.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 30, 1990.

Decided April 16, 1991.

Burton D. Fretz, with whom Toby S. Edelman and Bruce M. Fried were on the brief, for appellants.

Marleigh D. Dover, Attorney, Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty. and William Kanter, Atty., Dept. of Justice, were on the brief, for appellees. John F. Cordes and Richard K. Willard and Leonard Schaitman, Attys., Dept. of Justice, also entered appearances for appellees.

Robin Talbert was on the brief for amicus curiae urging that the Court remand the regulations to HHS.

Before WALD, RUTH B. GINSBURG and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

Dissenting Opinion filed by Circuit Judge WALD.

STEPHEN F. WILLIAMS, Circuit Judge.

In the Paperwork Reduction Act, 44 U.S.C. § 3501 et seq. (1988), Congress sought "to minimize the Federal paperwork burden for individuals, small businesses, State and local governments, and other persons." Id. § 3501(1). The act requires federal agencies to forward to the Office of Management and Budget "a copy of any proposed rule which contains a collection of information requirement." Id. § 3504(h)(1). If OMB "determines that the collection of information by an agency is unnecessary, for any reason, the agency may not engage in the collection of the information." Id. § 3508. We here consider whether a regulation vetoed by OMB qualifies as an information collection request, in light of Dole v. United Steelworkers of America, 494 U.S. 26, 110 S.Ct. 929, 108 L.Ed.2d 23 (1990).

The Age Discrimination Act of 1975, 42 U.S.C. § 6101 et seq. (1988), made the Secretary of Health and Human Services (actually Health, Education and Welfare, of which a part later became HHS, the term we will use throughout) responsible for promulgating regulations relating to age discrimination. The regulations were to serve as a model for ones to be issued later by each of the various federal agencies that extend federal financial assistance. Id. § 6103. HHS published its final model regulations on June 12, 1979. 44 Fed.Reg. 33,776 (1979). Included was a provision under which each adopting agency would require each of its funding recipients "to complete a written self-evaluation of its compliance under the Act ... [and to] make the self-evaluation available on request to the agency and to the public for a period of 3 years following its completion." 45 CFR § 90.43(b)(1) & (4) (1990). As HHS is itself an agency that extends federal financial assistance, it then proposed HHS-specific regulations that followed its own model, including the self-evaluation provision. 44 Fed.Reg. 55,108 (1979).

After HHS proposed its agency-specific regulations, but before final adoption, OMB exercised its authority under the Federal Reports Act of 1942, 44 U.S.C. §§ 3501 et seq., predecessor of the Paperwork Act, formally disapproving the self-evaluation provision of the model regulations. See letter from OMB to HHS, dated February 14, 1980, Joint Appendix ("J.A.") 89. HHS then modified the corresponding agency-specific self-evaluation requirement.[1] Under the final HHS-specific regulations a self-evaluation is required only when requested by HHS in conjunction with a compliance review or a complaint investigation. 45 C.F.R. § 91.33(b) (1990).

Action Alliance of Senior Citizens of Greater Philadelphia sued HHS and OMB, claiming among other things that provisions of this sort were not subject to OMB's authority under the Paperwork Act. This court upheld HHS's decision to submit to OMB, and thus indirectly upheld the action of OMB itself. Action Alliance of Senior Citizens of Phil. v. Bowen, 846 F.2d 1449 (D.C.Cir.1988). The Supreme Court granted certiorari and remanded to us for further consideration in light of Steelworkers, which held the Paperwork Act inapplicable to a hazard labelling and disclosure requirement. Action Alliance of Senior Citizens of Phil. v. Sullivan, —— U.S. ——, 110 S.Ct. 1329, 1330, 108 L.Ed.2d 469 (1990). Because we find no inconsistency between Steelworkers and our prior decision, we again uphold HHS's revision of its agency-specific regulations to conform with OMB's disapproval of the self-evaluation provision of the model regulations.

\*    \*    \*    \*    \*    \*

1. Interestingly, HHS never modified the model regulations, see Action Alliance of Senior Citizens of Phil. v. Bowen, 846 F.2d 1449, 1455 (D.C.Cir.1988), though OMB's action drained the self-evaluation component of legal effect, id.

The parties start with a dispute over whether the case is governed by the Paperwork Act or its predecessor, the Federal Reports Act of 1942, the Alliance arguing for the Paperwork Act, the government for the Reports Act. OMB disapproved of the self-evaluation provision of the model regulations in February 1980, before enactment of the Paperwork Act (December 11, 1980), and well before its effective date (April 1, 1981). But the Alliance challenges the final HHS-specific regulations, which were not promulgated until December 28, 1982, long after the Paperwork Act became effective. On the other hand, the Age Discrimination Act required agencies to follow the model regulation, 42 U.S.C. § 6103 (1988), so a case could be made that the controlling date should be that of OMB's ruling (February 14, 1980) or of HHS's adoption of the model regulations (June 12, 1979).

In the end we think it appropriate to sidestep all this. The primary purpose of the Paperwork Act was to make the government-mandated paperwork law clearer and to eliminate the exemptions from the OMB clearance process enjoyed by certain agencies under the Reports Act scheme. See 126 Cong.Rec. 6212 (1980) (remarks of Rep. Horton); 125 Cong.Rec. 16564 (1979) (remarks of Sen. Danforth). The Paperwork Act introduced little (if any) difference in the type of agency action subject to OMB review, and such change as it makes, on the issue on which the Supreme Court remanded, only tends to improve the government's position. See discussion of relevant provisions of the two acts at page 79, below. (The reason why the parties split as they do is a claim based on 44 U.S.C. § 3518(e), adopted as part of the Paperwork Act, which we resolved against plaintiffs in our prior treatment of the case, see 846 F.2d at 1454–55, and which we do not revisit today. See pages 83–84 below.) Thus we will address the issue under the currently effective Paperwork Act, but also note the congruence of the superseded Records Act.

■ Under the Paperwork Act, OMB's review authority encompasses all "information collection requests." See 44 U.S.C. § 3507 (1988). The act defines such a request as

a written report form, application form, schedule, questionnaire, reporting or *recordkeeping* requirement, *collection of information* requirement, or other similar method calling for the collection of information.

*Id.* § 3502(11) (1988) (emphasis added). Thus an agency request is subject to OMB disapproval if it embodies *either* a "recordkeeping requirement" *or* a "collection of information requirement". A "collection of information" is in turn

the obtaining or soliciting of facts or opinions by an agency through the use of written report forms, application forms, schedules, questionnaires, reporting or recordkeeping requirements, or other similar methods calling for ... answers to identical questions posed to, or *identical reporting or recordkeeping requirements imposed on*, ten or more persons....

*Id.* § 3502(4) (emphasis added). And a "recordkeeping requirement" is a "requirement ... to *maintain* specified records." *Id.* § 3502(17) (emphasis added).[2]

As OMB is the agency entrusted with the administration of the Paperwork Act, *Steelworkers*, 110 S.Ct. at 933, we are required under *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984), to uphold its interpretation unless it is barred by Congress's clear expression or is unreasonable. See also *Steelworkers*, 110 S.Ct. at 938.

On its face the phrase "recordkeeping requirement" appears to encompass the draft self-evaluation rule. The rule requires a funds recipient to "complete" the "self-evaluation of its [Age Discrimination Act] compliance" and to "make [it] avail-

---

**2.** The Reports Act simply defined "information" as

facts obtained or solicited by the use of written report forms, application forms, sched-

ules, questionnaires, or other similar methods calling ... for answers to identical questions from ten or more persons ...

44 U.S.C. § 3502 (1976).

able on request to the agency and to the public" for a period of three years. 45 CFR § 90.43(b)(4) (1990). Thus it seems to require the recipient "to maintain specified records".

The self-evaluation regulation also appears to fit the "collection of information" definition. The regulation directs funds recipients "to complete a written self-evaluation of [their] compliance under the [Age Discrimination] Act", and to make that report "available on request to the agency and to the public". 45 CFR § 90.43(b)(4) (1990). This appears to be the "soliciting of facts or opinions by an agency through the use of ... identical reporting or recordkeeping requirements".

The Alliance argues that because "no federal agency has apparently sought to collect information contained in a recipient self-evaluation", Alliance Brief at 15, the self-evaluations are not maintained for agency use, and therefore cannot be "recordkeeping requirements". Even if we assumed that availability to the agency were essential for Paperwork Act review, the self-evaluation regulation meets that test, explicitly requiring the federal funds recipient to "make the self-evaluation available to the agency" as well as to the public. See S.Rep. 1411, 96th Cong., 2d Sess. at 40, U.S.Code Cong. & Admin.News 1980, pp. 6241, 6280 ("The term 'recordkeeping requirement' ... includes information maintained by persons *which may be but is not necessarily provided to a Federal agency*") (emphasis added). Obviously the burden of collecting and maintaining information is not diminished merely because the agency disdains the information that it forced the private party to create. See 126 Cong.Rec. 6212 (1980) ("this bill provides for the implementation of a very important concept: That the Federal Government should treat information as a resource, not a free good....") (remarks of Rep. Horton). It would be a startling irony if OMB's power were lacking in precisely the case where the need for its exercise was greatest—where an agency compels the costly generation of data that it never bothers to study.

In a closely related argument, the Alliance suggests a distinction between information directly collected by an agency and information merely required to be made available to it on request, claiming that the latter is not encompassed by "collection of information". But by insisting on the information's availability to the relevant agency, the self-evaluation requirement *"solicit[s]* ... facts or opinions ... through the use of ... identical reporting or recordkeeping requirements". 44 U.S.C. § 3502(4) (emphasis added).

Moreover, in adopting the Paperwork Act Congress had before it the policy statements and regulations of OMB by which it (and its predecessor) had consistently exercised their Reports Act authority simply on the basis of officially mandated availability to an agency, and the legislative history reflects an intent to maintain (or expand) this prior authority. Thus the Senate Report endorsed prior practice in these terms:

> The 'collection of information' definition does not change the scope of current authority and practice by the Director of OMB and the Comptroller General to promulgate rules and regulations needed to interpret the relationship of certain kinds of information to the definition of collection of information. This practice is presently evident in OMB Circular A–40 and GAO regulations (4 CFR Part 10). Previous editions of Circular A–40 and GAO regulations demonstrate how this authority has been used during the 37–year history of the original Federal Reports Act.

S.Rep. 96–930, 96th Cong., 2d Sess. at 39, U.S.Code Cong. & Admin.News 1980, p. 6279; *see* also *id.* at 13 (reflecting intent in some particulars to expand authority over collection of records by precluding certain formerly arguable limitations). OMB Circular A–40, one of the prior agency interpretations listed, said: "When a person or organization is requested by a Federal agency to collect specific information *to be made available to the agency,* the plan or report form ... used to collect this information must be regarded as sponsored...." OMB Circular A–40 (revised November 5, 1976), reprinted at J.A. 128,

132 (emphasis added). See also Regulation A, Federal Reporting Services, Clearance of Plans and Reports Forms, Title I(1)(e) (February 13, 1943), reprinted in HHS Brief ("[a]ny general or specific requirement for the *establishment or maintenance* of records ... which are *to be used or be available for use* in the collection of information") (emphasis added).

Further, the *Steelworkers* majority itself observed that a requirement of availability to an agency was enough to bring a data-collection regulation under the Paperwork Act. It instanced tax and business records and compliance reports as being among "[t]ypical information collection requests", 110 S.Ct. at 933, and also said that they

> are examples of information provided only indirectly to an agency. In these cases, the governing regulations do not require records to be sent to the agency; they require only that records be kept on hand for possible examination as part of a compliance review.

*Id.* at 933 n. 4. Forced availability is enough.

■ The Alliance's final argument rests on a distinction drawn by the *Steelworkers* opinion between collection of data for such purposes as determining whether "to initiate enforcement measures", *id.* at 933, and requirements that "represent[ ] a substantive regulatory choice," *id.* The Alliance believes that the self-evaluation requirement must be substantive because HHS had justified the requirement as "impos[ing] upon recipients a primary responsibility for ensuring compliance with the [Age Discrimination] Act", 43 Fed.Reg. at 56,437, and had stated that its primary purpose was "internal review by the recipient," 44 Fed.Reg. at 33,785. See Alliance Brief at 14–15.

The regulation under review in *Steelworkers* was a "Hazard Communications Standard" issued by the Department of Labor requiring employers to supply all employees in multi-employer sites "with data sheets describing the hazardous substances to which they were likely to be exposed". 110 S.Ct. at 932.[3] As the Court said, the rules "mandat[ed] disclosure by one party *directly to a third party* ". See *id.* at 938 (emphasis added). The Court outlined the choices open to the regulating agency as (1) a simple ban on the chemicals in question, (2) a mandate of specific safety solutions such as gloves or goggles, and (3) a system of required warnings and labels. The agency selected disclosure, the Court observed, because it believed "that such a requirement is the least intrusive measure that will sufficiently protect the public." *Id.* at 933.

We do not believe the regulation here is "substantive" as the term is used in *Steelworkers*. It appears both in form ("a written self-evaluation of [the recipient's] compliance") and in function considerably more like the tax records and compliance reports that the Court recognized as covered by the Paperwork Act (see 110 S.Ct. at 933 & n. 4) than like the OSHA disclosure rules that it found exempt.

First, we question whether a regulation's "substantive" characterization is relevant at all where, as here, it requires data to be collected and made available to the agency, and both agencies (as well as plaintiffs) have throughout the proceedings treated the regulation as a unit. The Court in *Steelworkers* observed that mandatory agency availability is a feature of what it dubbed "[t]ypical information collection requests". *Id.* at 933. Such requests, it said, "share at least one characteristic: *The information requested is provided to a federal agency, either directly or indirectly.*" *Id.* (emphasis added).[4]

---

3. "The data sheets were to list the physical characteristics and hazards of each chemical, the symptoms caused by overexposure, and any pre-existing medical conditions aggravated by exposure. In addition, the data sheets were to recommend safety precautions and first aid and emergency procedures in case of overexposure, and provide a source for additional information." *Id.* at 931.

4. In *Steelworkers,* the Department of Labor had adopted a requirement of agency availability covering the information to be disclosed to workers, but as OMB did not strike it down, the Court did not address it. *See* 110 S.Ct. at 938 n. 11.

Second, we believe that a standard of conduct is substantive in the sense used by the Court if it fulfills the agency's ultimate statutory goal, *independently* of its tendency to enhance compliance with other norms. By this reading, measures that simply increase the likelihood that regulatees or recipients will comply with standards defined elsewhere are not substantive.[5]

In *Steelworkers*, disclosure directly served the agency's safety purposes. It did so *not* because it enhanced compliance with some other standard, but because the disclosure would enable possible victims of the chemicals' side effects to protect themselves. While the self-evaluation requirement would also have advanced the substantive goals of the Age Discrimination Act, it would have done so in essentially the manner of tax records and compliance reports—by enhancing compliance with norms defined elsewhere, both by adjusting the regulatees' mindset and by facilitating agency enforcement.

The Court's reading suggests a view that while Congress feared wasteful paper-shuffling in data collections that serve only as a method of inducing compliance, it had less concern (or none) as to data transmissions that directly accomplish the agency's ultimate goal. Indeed, Congress may well have believed that agencies suffered an especially severe temptation to wasteful data collections for compliance enhancement, as these would enable the agencies to shift enforcement costs from themselves to regulated parties.

It is true that *Steelworkers* observed that if " 'reporting and recordkeeping requirement' is understood to be analogous to the examples surrounding it, the phrase would comprise only rules requiring information to be sent or made available to a federal agency, not disclosure rules." 110 S.Ct. at 935. In context, we do not think the Court's contrast can be taken as making agency availability a necessary condition of Paperwork Act coverage. The

Court is more sensibly seen as stressing the difference between data that informs the relation between regulatee or fund recipient and agency, and disclosures to a specific class of third parties otherwise likely to be injured by the product described. *See id.* at 934 (requirement that someone "communicate specified data to a third party" is not "soliciting facts").

While this case is easy because of the agencies' agreement that the regulation, including the agency availability requirement, is to be treated as an integral whole, see page 9 above, conditioning OMB's Paperwork Act authority on such a requirement would invite a kind of sham. Agencies could omit any express provision for availability, relying on their general enforcement powers both to secure access to records whose maintenance they compel, and to penalize the regulatee's failure to create them.

Plaintiffs lay great stress on evidence in the rulemaking record that HHS's purpose in requiring self-evaluations was to advance substantive anti-discrimination goals. We do not doubt it. But, as we said above, the role of the self-evaluations is essentially the same as that of tax and other compliance records—to bring behavior into compliance with substantive standards outside the requirement. The test is a functional one. It does not require OMB (and then a court, in review) to study the context and agency "legislative" history of a regulation to make some elusive finding of its primary or main or important purpose. Not only would such a test be extremely hard to apply, involving a dubious weighing of joint purposes, but it would be readily manipulated by agencies, enabling them to escape OMB review by larding their regulatory preambles with gratuitous claims of acceptable "substantive" purposes.

Congress and HHS clearly hoped that the Age Discrimination Act would correct discriminatory stereotyping, see, e.g., dissent at 87 (citing items from legislative history of the Act), but these hopes do not

---

**5.** While this distinction cannot handle a self-evaluation requirement imposed by an agency charged with enforcing the Greek maxim

"Know thyself", we leave that Orwellian hypothetical to another day.

change the analysis. The link between right conduct and right thinking was observed at least as early as Aristotle: "[W]e become just by doing just acts, temperate by doing temperate acts, brave by doing brave acts." Nichomachean Ethics, Book II, Ch. 1. But neither of the political branches saw attitude change, divorced from conduct change, as an independent regulatory goal. The Act and regulations established norms of substantive conduct, designed to protect older Americans from *behavior* deemed unfair; the agency quite understandably believed that mandatory self-evaluations of compliance with the Act would, like tax and other compliance records, lead to conduct conforming to the prescribed norms.

HHS, we note, made it quite clear that among the purposes of the self-evaluation regulation was one specified by *Steelworkers* as a characteristic of covered information collections, namely, monitoring compliance for purposes of enforcement activity. See *Steelworkers*, 110 S.Ct. at 933. The self-evaluation regulation was promulgated as part of "Subpart D—Investigation, Conciliation and Enforcement Procedures", 45 CFR § 90 Subpart D, and the immediately preceding regulation noted that a funds recipient would have the "responsibility to maintain records, provide information, and to afford access to its records to an agency to the extent required to determine whether it is in compliance with the Act", 45 CFR § 90.42(a).

In sum, because HHS's self-evaluation rule requires a fund recipient to collect data describing its compliance with the norms of the Age Discrimination Act, we find it more akin to the tax and compliance records that are subject to the Paperwork Act than to the disclosure and warning system that *Steelworkers* found exempt.

\* \* \* \* \* \*

The Alliance also raises two other challenges to the final HHS-specific self-evaluation provision. First, it argues that the

self-evaluation provision is exempt from OMB review by virtue of 44 U.S.C. § 3518(e) (1988).[6] Second, it claims that HHS's change in the self-evaluation provision created such a gap between the proposed and final HHS-specific rules as to have obligated HHS to issue a new notice and initiate a new round of comment, in order to satisfy the informal rulemaking requirements of the Administrative Procedure Act, 5 U.S.C. § 553(b) (1988). We rejected both arguments in our prior opinion. *Action Alliance*, 846 F.2d at 1454–55 (rejecting the § 3518(e) claim as based on too broad a reading of the statute); *id.* at 1455–56 (finding no new notice necessary in light of the constraint provided by the OMB disapproval).

Although the Supreme Court vacated our prior opinion, *see Action Alliance*, 110 S.Ct. at 1330, it expressed no opinion on the merit of these holdings. They therefore continue to have precedential weight, and in the absence of contrary authority, we do not disturb them. *See, e.g., Hopkins v. Price Waterhouse*, 920 F.2d 967, 975 & n. 5 (D.C.Cir.1990); *U.S. ex rel. Espinoza v. Fairman*, 813 F.2d 117, 125 n. 7 (7th Cir. 1987) (decision vacated by Supreme Court remains persuasive precedent so long as the Court did not reject the lower court decision's underlying reasoning); *Christianson v. Colt Industries Operating Corp.*, 870 F.2d 1292, 1298 (7th Cir.1989) ("although vacated, the decision stands as the most comprehensive source of guidance available on the ... questions at issue in this case."); *County of Los Angeles v. Davis*, 440 U.S. 625, 646 n. 10, 99 S.Ct. 1379, 1391 n. 10, 59 L.Ed.2d 642 (1979) (Powell, J., dissenting) ("Although a decision vacating a judgment necessarily prevents the opinion of the lower court from being the law of the case, ... the expressions of the court below on the merits, if not reversed, will continue to have precedential weight and, until contrary authority is decided, are likely to be viewed as per-

6. The section provides:
  Nothing in this chapter shall be interpreted as increasing or decreasing the authority of [OMB] with respect to the substantive policies and programs of departments ..., including the substantive authority of any Federal agency to enforce the civil rights laws.

suasive authority if not the governing law....") (citations omitted).[7]

\* \* \* \* \* \*

For the foregoing reasons, the petition for review is denied.

*So Ordered.*

WALD, Circuit Judge, dissenting:

I believe this case is controlled by the Supreme Court's decision in *Dole v. United Steelworkers of America,* 494 U.S. 26, 110 S.Ct. 929, 108 L.Ed.2d 23 (1990). I find that the "self-evaluation requirement" in this case resembles the "hazard communication requirement" at issue in *Dole* closely enough so that *Dole*'s reasoning removes the self-evaluation requirement from OMB review under the Paperwork Reduction Act.

## I.

In *Dole,* the Supreme Court reviewed the Office of Management and Budget's ("OMB") disapproval of disclosure requirements under which the Occupational Safety and Health Administration ("OSHA") required employers to make available to employees extensive information concerning hazardous chemicals in the workplace. *See* 29 C.F.R. § 1910.1200 (1988). The Court ruled that the Paperwork Reduction Act ("Paperwork Act") did not authorize OMB to review or disapprove such disclosures. In doing so, the Court emphasized two aspects of disclosure requirements. First, a disclosure requirement "represents a substantive regulatory choice" that "such a requirement is the least intrusive measure that will sufficiently protect the public." 110 S.Ct. at 933. Second, a disclosure requirement does not involve "an agency's efforts to gather facts for its own use." *Id.* at 934. Because of these two factors, the Court concluded, a disclosure requirement was not an "information collection request" under the Paperwork Act, and therefore was not subject to OMB review.

The self-evaluation requirement at issue in this case bears the same critical features identified by the *Dole* Court. First, the self-evaluation requirement embodies a substantive regulatory choice. Just as OSHA determined that a disclosure requirement was "the least intrusive measure that will sufficiently protect the public," *id.* at 933, so the Department of Health and Human Services ("HHS") determined that a less intrusive weapon in combating age discrimination was to require recipients to take a hard look at their own policies and practices. The parallel between the disclosure and self-evaluation requirements is striking, as the following passage from *Dole, mutatis mutandis,* illustrates:

> An agency charged with protecting employees from hazardous chemicals [read "ending age discrimination"] has a variety of regulatory weapons from which to choose: It can ban the chemical altogether ["ban certain types of age distinctions"]; it can mandate specified safety measures ["establish goals or timetables"]; or it can require labels or other warnings ["require self-evaluation"]. An agency chooses to impose a warning requirement ["a self-evaluation requirement"] because it believes that such a requirement is the least intrusive measure that will sufficiently [fulfill its statutory mandate].

110 S.Ct. at 933. Thus, like OSHA's disclosure requirement, HHS' self-evaluation requirement embodies an agency's substantive regulatory choice.

Second, the self-evaluation requirement—again like the disclosure requirement—does not involve "an agency's efforts to gather facts for its own use." *Id.* at 934. Indeed, in promulgating its final rules, HHS (then the Department of Health, Education, and Welfare ("HEW")) directly and expressly rejected suggestions that self-evaluations be used for enforcement purposes.

---

7. Judge Ruth B. Ginsburg, who was drawn to replace original panel member Judge Starr, cast no vote on the merits of the § 3518(e) and notice-and-comment issues. She agrees, however, that the remand in *Steelworkers* does not bear on, and therefore should not unsettle, the original panel's resolution of those issues.

*Comment:* Several commenters [on the proposed self-evaluation requirement] stated that all self-evaluations should be subjected to a review.... Other commenters suggested that the funding agency spot check recipients' self-evaluations.... Generally, commenters stated that self-evaluations alone would be insufficient to meet the [Age Discrimination Act ("ADA")] reporting requirements.

. . . .

*Response:* HEW believes that *the primary purpose of the self-evaluation is internal review by the recipient.* The self-evaluation process is not intended to yield sufficient information to satisfy the ADA reporting requirements.

44 Fed.Reg. at 33,784–85 (1979) (emphasis supplied). As these remarks clearly demonstrate, HHS intended that the self-evaluation requirement be for the recipient's use, not "for [the agency's] own use." Thus, in this regard as well, the self-evaluation requirement is indistinguishable from the disclosure requirement in *Dole.*

Stated more generally, *Dole* established that OMB's jurisdiction under the Paperwork Act did not extend to information requests that, *taken alone and without further agency action, advance the ends*

*of the relevant statute.*[1] Thus, what distinguishes the disclosure requirement in *Dole* from other information requests is that hazard disclosure, *taken alone,* reduces workplace injuries and thus advances the ends of the relevant statute (the OSH Act). The same cannot be said of the standard variety of agency information-collection requests. The collection of receipts or records for tax purposes does not in and of itself generate revenue; it merely facilitates subsequent agency enforcement actions. Similarly, the collection of financial information by license applicants does not, taken alone, ensure that the Federal Communications Commission's licensing requirements will be met; instead such collection is merely "a means of acquiring information useful in performing some *other* agency function," 110 S.Ct. at 933–34 (emphasis supplied), namely, enforcement.

In contrast, HHS' self-evaluation requirement, like the hazard disclosures in *Dole,* is an end in itself. HHS believed that, through self-scrutiny, recipients would begin to recognize and eliminate discriminatory practices. HHS expressly stated that self-evaluations were not a means of agency enforcement, but rather themselves a way of combatting discrimination.[2] Given

---

1. The Paperwork Act itself expressly provides that

> Nothing in this chapter shall be interpreted as increasing or decreasing the authority of [OMB] with respect to the *substantive policies or programs of ... agencies....*

44 U.S.C. § 3518(e) (emphasis supplied). The government contends that this case is governed by the Federal Reports Act, the predecessor of the Paperwork Act. Like the majority, I need not decide that issue, for I conclude that in all relevant respects the two statutes are identical. Although the Federal Reports Act did not expressly bar OMB's regulation of "substantive policies" as does the Paperwork Act's § 3518(e), Congress clearly intended as much. Indeed, in enacting § 3518(e), Congress noted that

> [t]his provision results from concern that the authority of this Act might be used to increase the power of OMB over substantive policy. [T]here have been problems along that line in the past. It has been argued that the Federal Reports Act ... was used to interfere with regulatory policy.... Those arguments prompted Congress to remove the independent agencies from OMB supervision back in 1973—and place those agencies under GAO.

S.Rep. No. 930, 96th Cong., 2d Sess. 56, *reprinted in* 1980 U.S.Code Cong. & Admin.News 6241, 6296; *see also* H.R.Conf.Rep. No. 924, 93d Cong., 1st Sess. 10–11, *reprinted in* 1973 U.S. Code Cong. & Admin.News 2523, 2533–34. I understand these congressional discussions to indicate that Congress did not intend the Federal Reports Act to allow OMB to control the "substantive policies or programs" of federal agencies.

2. The idea that critical self-evaluation is an important means of battling discrimination is not novel. Courts, in other contexts, have long recognized the importance of such introspective techniques. *Cf. Albemarle Paper Co. v. Moody,* 422 U.S. 405, 417–18, 95 S.Ct. 2362, 2371–72, 45 L.Ed.2d 280 (1975) (emphasizing the importance, in title VII actions, of remedies "which cause[ ] employers and unions to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges of" discrimination); *see also Penk v. Oregon State Board of Higher Education,* 99 F.R.D. 511, 512 (D.Or.1983) (discussing whether self-evaluations should be discoverable and noting that "candid self-evaluation is proba-

these characteristics, I conclude that the self-evaluation requirement is, for purposes of the Paperwork Act, similar to the disclosure requirement in *Dole*. And, pursuant to *Dole*, I also conclude that such self-evaluations are beyond OMB review under the Paperwork Act.

## II.

The majority distinguishes this case from *Dole* on two grounds. The first of these can be dispatched quickly. The majority first suggests that the "requirement of availability to an agency [is] enough to bring a data-collection regulation under the Paperwork Act," Majority opinion ("Maj. op.") at 81, and that such a requirement is present in this case, but was not in *Dole*. Actually, however, there is no real difference between this case and *Dole* insofar as the existence of an agency-availability requirement is concerned. As the majority notes, OSHA regulations *did* require that hazard disclosures—like self-evaluations—be made available to the agency. *See* 29 C.F.R. § 1910.1200(e)(4). The only difference between the two cases, then, is this: while in *Dole* OMB did not explicitly disapprove the agency-availability requirement,[3] in this case, OMB appears to have disapproved both the self-evaluation and the agency-availability requirements.

This distinction cannot plausibly dictate a different outcome from that which the Supreme Court reached in *Dole*. The *Dole* court ruled that OMB did not have jurisdiction to disapprove the disclosure requirement; it surely cannot be the case that simply by disapproving *both* the disclosure and the availability requirements OMB could magically extend its own authority. To allow the tail to wag the dog in this way would render *Dole* meaningless.

The majority relies most heavily on a second contention: that a self-evaluation is merely a compliance record—no different from, say, tax records. This contention, however, is directly contrary to the language, structure, and purpose of the self-evaluation requirement.

The most obvious evidence that a self-evaluation is not merely an enforcement report is the *name* of the requirement. HHS did not style the requirement as a "compliance report," or a "performance record," but as a *"self-evaluation."* The label could not be more accurate: the object of the requirement is to have recipients *evaluate themselves*. This plain meaning is reinforced by the structure of the regulation which indicates that HHS did *not* intend the self-evaluation to be an enforcement tool.[4] HHS set forth the procedures for compliance reviews in a separate section (§ 90.44), making no reference there to the self-evaluations. Also, when outlining a recipient's duty to "[p]ermit reasonable access by the agency to ... sources of information" necessary to determine compliance, HHS again made no mention of the self-evaluations. 45 C.F.R. § 90.45(b).

Moreover, events subsequent to OMB's disapproval of the self-evaluation requirement further indicate that HHS did not intend the self-evaluation requirement to be an enforcement device. After OMB disapproved the self-evaluation requirement, HHS, in an effort to comply with OMB's decision, amended the regulation to provide that self-evaluation would *only* be required in conjunction with an agency enforcement action. *See* 47 Fed.Reg. at 57,860; 45 C.F.R. § 91.33(b). This, it seems to me, clearly indicates that both HHS and OMB understood the original self-evaluations at

bly necessary in order to achieve voluntary compliance with the employment discrimination laws"); *Jamison v. Storer Broadcasting Co.,* 511 F.Supp. 1286 (E.D.Mich.1981) (same).

**3.** OMB did not need to disapprove explicitly the availability requirement because, having disapproved the hazard communication itself, the availability requirement was meaningless.

**4.** Although one subsection of the disapproved regulation does use the word "compliance," *see*

45 C.F.R. § 90.43(b)(1), that single word does not demonstrate that the purpose and function of the self-evaluation was to enhance agency enforcement. Instead, in context, "compliance under the Act" is merely a shorthand for the contents of the self-evaluation—namely, the "identif[ication] and justif[ication of] each age distinction imposed by the recipient." 45 C.F.R. § 90.43(b)(2).

issue in this case to be something very different from compliance reports.

Finally, as noted, HHS articulated the purpose of self-evaluations as *"internal review by the recipient."* 44 Fed.Reg. at 33,785 (emphasis supplied). In introducing the regulations, HHS framed the "major issue" as the need to correct "age distinctions [that] may be based on nothing more than stereotypes and misconceptions about the abilities and needs of persons of different ages." 43 Fed.Reg. at 56,428 (1978). As the regulations reflect, HHS believed that one important way to eliminate such stereotypes was through self-evaluations.

In sum, the language, structure, and purpose of the self-evaluation requirement belie the majority's claim that that requirement is nothing more than a compliance record. HHS clearly believed that the self-evaluations, taken alone, would aid in redressing the problems of age discrimination.

### III.

Distilled to its essence, OMB's critical error was to substitute its vision of anti-discrimination law for HHS' vision. As illustrated, HHS believed that anti-discrimination law required recipients to modify their attitudes and values, that battling discrimination involved not only barring certain behaviors, but also debunking stereotypes and exposing prejudices. The origins of HHS' vision of anti-discrimination law can ultimately be traced to a federal study mandated by the Age Discrimination Act itself.

> Prior to the enactment of any regulations, the Act required the Commission on Civil Rights to conduct a study of age discrimination in federally funded programs and activities. [*See* 42 U.S.C. § 6106.].... The Act also required each affected federal agency to respond to the Commission's findings or recommendations [before promulgating regulations].

43 Fed.Reg. at 56,428. One of the Commission's critical findings was that, in federally funded programs, *"Negative staff atti-*

*tudes toward older persons predispose program administrators to neglect or avoid serving older persons."* U.S. Commission on Civil Rights, *The Age Discrimination Study* at 36 (1977) (emphasis in original). Based on the Commission's report, *see* 43 Fed.Reg. at 8,756, and on subsequent hearings, HHS proposed its regulations, including the self-evaluation requirement. As this history indicates, HHS believed self-scrutiny to be an important way of battling "negative [ ] attitudes" and required self-evaluations as a means—in and by itself—of combatting discrimination.

OMB apparently rejected this vision and imposed upon HHS a different conception of anti-discrimination law. Adopting what might be called a "regulatory" approach to anti-discrimination law, OMB suggested that fighting discrimination is not about changing attitudes or values, but simply about prohibiting certain behaviors. Thus, from OMB's perspective, the only way for HHS to fulfill its statutory mandate is through policing, enforcing, and sanctioning such behavior; self-evaluations must, therefore, be part of these efforts.

The majority defers to OMB's approach to anti-discrimination law. They therefore conclude that self-evaluations cannot *"independently ... fulfill[ ]* the agency's ultimate statutory goal," Maj. op. at 82 (emphasis in original), and equate self-evaluations with "tax records and compliance reports [that merely] adjust[ ] the regulatees' mindset and [ ] facilitat[e] agency enforcement." *Id.* But such an analysis misses the point: "adjusting the regulatees' mindset" is, at least in HHS' view, what anti-discrimination law is all about.

OMB is the agency charged with enforcing the Paperwork Act and, accordingly, is entitled to significant judicial deference. Nonetheless, if the Supreme Court's decision in *Dole* means anything, it means that when it comes to substantive matters— such as the preferred understanding of anti-discrimination law—the Paperwork Act limits OMB's authority.[5] Whatever

---

**5.** The majority recognizes that Congress and HHS "hoped that the Age Discrimination Act

the merits of these two visions of anti-discrimination law, *Dole* established beyond doubt that it is not the role of OMB to superimpose its opinion of the "better" view onto agency regulations or to trump an agency's considered, substantive judgment simply because it disagrees with that judgment.

For these reasons, I respectfully dissent.[6]

would correct discriminatory stereotyping," but erroneously concludes that "neither of the political branches saw [this objective] as an independent regulatory goal." Maj. op. at 82–83. If by the executive branch the majority means HHS, its conclusion is incorrect: as demonstrated above, the very promulgation of the regulation indicates that HHS understood the revision of attitudes and values to be an "independent regulatory goal." (And under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), this court must defer to HHS' reasonable interpretation of the Age Discrimination Act.) If, on the other hand, the majority refers to OMB, its conclusion is also unsound: under *Dole*, OMB must defer to HHS' substantive judgments.

6. For the reasons set forth in my original dissent, *see Action Alliance of Senior Citizens of Philadelphia v. Bowen*, 846 F.2d 1449, 1458–59 (D.C.Cir.1988), *vacated,* —— U.S. ——, 110 S.Ct. 1329, 108 L.Ed.2d 469 (1990), I continue to dissent from the majority's treatment and resolution of the notice and comment issue.