# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 3, 2021        Decided March 29, 2022

No. 20-7114

RAMONA MATOS RODRIGUEZ, ET AL.,
APPELLEES

v.

PAN AMERICAN HEALTH ORGANIZATION,
APPELLANT

JOAQUIN MOLINA, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:20-cv-00928)

———

*David W. Bowker* argued the cause for appellant. With him on the briefs were *Patrick J. Carome* and *Daniel S. Volchok*.

*Jeffrey T. Green* and *Marisa S. West* were on the brief for *amici curiae* The International Bank for Reconstruction and Development, et al. in support of appellant.

*Samuel J. Dubbin* argued the cause for appellees. With him on the brief were *Jonathan W. Cuneo*, *Charles J. Cooper, Michael W. Kirk*, *Haley N. Proctor* and *Joseph O. Masterman.*

*Martina E. Vandenberg* and *Stuart A. Raphael* were on the brief for *amicus curiae* Human Trafficking Legal Center in support of appellees. *Elbert Lin* entered an appearance.

*Agnieszka M. Fryszman* was on the brief for *amici curiae* Senator Robert Menendez, et al. in support of appellees.

*Lewis Yelin*, Attorney, U.S. Department of Justice, argued the cause for *amicus curiae* The United States in support of neither party. With him on the brief were *Brian M. Boynton*, Acting Assistant Attorney General, and *Sharon Swingle*, Attorney.

Before: HENDERSON, TATEL and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: A group of Cuban physicians (physicians) sued the Pan American Health Organization (PAHO) for its role in facilitating Brazil's *Mais Médicos* (translated, "More Doctors") program, under which Brazil hired foreign physicians to augment its medical services provided to impoverished Brazilians. Cuba supplied physicians to the program, allegedly without their consent and in violation of human trafficking laws. The physicians sued PAHO for, *inter alia*, acting as a financial intermediary between Brazil and Cuba. PAHO moved to dismiss the suit, asserting immunity under both the International Organizations Immunities Act (IOIA), 22 U.S.C. § 288, and the World Health Organization (WHO) Constitution, *Constitution Adopted by the United States of America and Other Governments Respecting a World Health Organization*, June 21, 1948, 62 Stat. 2679, T.I.A.S. No. 1808. The district court denied dismissal of the claim that

PAHO acted as a financial intermediary and PAHO appeals therefrom. As detailed *infra*, we affirm.

## I. BACKGROUND

On review of a dismissal denial, "we must accept as true all material allegations of the complaint, drawing all reasonable inferences from those allegations in plaintiffs' favor, and presuming that general allegations embrace those specific facts that are necessary to support the claim." *LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011) (cleaned up). We recite the facts accordingly.

In 2012, Brazilian and Cuban officials discussed Cuba's "export[ing]" medical services to Brazil. *Rodriguez v. Pan Am. Health Org.*, 502 F. Supp. 3d 200, 208 (D.D.C. 2020). According to the United States Department of State, Cuba relies on "medical missions" as a significant source of income and recruits physicians under the threat of "harsh social, economic, political[,] personal, reputational, and legal repercussions." *Id.* Cuba proposed sending six thousand internal medicine specialists to Brazil. *Id.* Brazilian officials did not want to enter into an "intergovernmental agreement," which required approval of the Brazilian Congress and thus could "generate controversy." *Id.* To avoid an intergovernmental agreement, Brazilian officials proposed using PAHO as an intermediary. *Id.* Accordingly, PAHO entered into an agreement with Brazil and Cuba, the "Technical Cooperation Agreement Between the Ministry of Public Health of the Republic of Cuba and the Pan American Health Organization/World Health Organization for Expanded Access by the Brazilian Population to Primary Health Care" (Agreement).

PAHO's participation in the *Mais Médicos* program is somewhat ambiguous, as the complaint alleges two alternative

roles that PAHO played. First, the complaint alleges that PAHO directly participated in human trafficking. PAHO "knowingly provided and obtained the labor or services of Plaintiffs by threats of force, physical restraint, threats of physical restraint, serious harm, threats of serious harm, abuse of laws and legal process, threats of abuse of laws and legal process, and by participating in a scheme, plan, or pattern intended to cause Plaintiffs and Class members to believe that if they did not comply with the restrictions and work under the conditions PAHO instituted and enforced, they would suffer serious harm or physical restraint." App. 123. By its alleged conduct, the complaint continues, PAHO violated the Trafficking Victims Protection Act (TVPA), 18 U.S.C. § 1589(a) (prohibiting "provid[ing] or obtain[ing] the labor or services of a person" by force or threat). The complaint also alleges that "PAHO . . . knowingly participated in the recruitment, harboring, and transportation of, and provided and obtained Plaintiffs' labor and services," in violation of § 1590 (prohibiting "transport[ing] . . . any person for labor or services in violation of this chapter"). App. 124.

Alternatively, the complaint alleges that PAHO acted as a financial intermediary between Brazil and Cuba, to wit: "PAHO . . . entered into a bilateral agreement with the Cuban government to guarantee it would transfer resources from third parties as a way to compensate Cuba for the utilization of its medical professionals, i.e. to 'triangulate' health care cooperation which is 'compensated,' through the 'movement of resources.'" App. 88–89. According to the physicians, PAHO's role included moving money, for a fee, between the countries. App. 64, 66, 70, 72. Brazil made payments to PAHO's Citibank account in Washington, D.C and PAHO then forwarded 85% to Cuba, 10% to the physicians and retained 5% for its services. App. 71–72.

The complaint acknowledges that under the Agreement, PAHO is to provide technical medical expertise necessary to facilitate the *Mais Médicos* program. "In June of 2012, PAHO entered into an agreement with the Government of Cuba that call[ed] for PAHO [t]o facilitate international cooperation . . . and the triangulation in health care cooperation and the moving of resources." App. 72 (internal quotation marks omitted) (second alteration in original). Under the Agreement, then, PAHO was to serve as a "broker—for a fee—of medical services" and "triangulat[e] health care services between Cuba and [Brazil] for compensation" App. 66, 72–73 (internal quotation marks omitted). According to the complaint, however, PAHO's outward role to "facilitate" or "triangulate" medical services was merely a "pretext for being a conduit of money." App. 88.

Four Cuban *Mais Médicos* physicians escaped to the United States and filed a class-action suit against PAHO in the U.S. District Court for the Southern District of Florida. *Rodriguez*, 502 F. Supp. 3d at 209. The complaint contains two civil counts: first, PAHO participated in human trafficking and violated the TVPA, 18 U.S.C. §§ 1589, 1590; and, second, PAHO conspired to provide involuntary labor and thus violated the Racketeering Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962. PAHO successfully moved to transfer the case to the U.S. District Court of the District of Columbia as the correct venue under the IOIA. *Rodriguez*, 502 F. Supp. 3d at 209; *see* 28 U.S.C. § 1391(f), (f)(4) ("civil action against a foreign state . . . may be brought . . . in the United States District Court for the District of Columbia"). PAHO moved to dismiss on immunity, abstention and improper service grounds. 502 F. Supp. 3d at 211–36.

The district court determined that "Count I"—alleging that PAHO violated the TVPA—itself included three separate

claims. *Id.* at 209–10. First, PAHO obtained and provided human labor through intimidation, violating 18 U.S.C. § 1589(a) (prohibiting "provid[ing] or obtain[ing] the labor or services of a person" by force or threat). *Rodriguez*, 502 F. Supp. 3d at 210. Second, PAHO benefitted financially from human trafficking, violating 18 U.S.C. § 1589(b) (prohibiting "knowingly benefit[ting], financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by" force or threat). *Rodriguez*, 502 F. Supp. 3d at 210. Third, PAHO "trafficked" Cuban physicians, violating 18 U.S.C. § 1590 (prohibiting "transport[ing] . . . any person for labor or services in violation of this chapter"). *Rodriguez*, 502 F. Supp. 3d at 210.

The district court upheld PAHO's IOIA immunity as to the first and third TVPA claims as well as the RICO claim, *id.* at 211–23, and held those claims in abeyance while it determined whether to allow jurisdictional discovery, *id.* at 236–37. Accordingly, those claims are not yet before us.

On the second TVPA claim, the district court rejected PAHO's IOIA immunity. Because the IOIA grants designated international organizations the same immunity as foreign sovereigns, 22 U.S.C. § 288a(b), the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1602, governs the immunity of international organizations also. *Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 772 (2019). Under the FSIA, an entity loses its immunity if its challenged "action is based upon a commercial activity carried on in the United States." 28 U.S.C. § 1605(a)(2). The district court concluded that the commercial activity exception applies because "it is . . . a normal commercial function to act as a financial intermediary transferring funds, for a fee, from one entity to another." *Rodriguez*, 502 F. Supp. 3d at 215. The district court rejected

PAHO's argument that the action was "based upon" forced labor abroad[1] because "Plaintiffs' 1589(b) claim turns on separate and separately wrongful conduct, distinct from any acts that could form the basis of a claim against Cuba or Brazil, by a defendant other than Cuba or Brazil—to wit, PAHO's procurement of a financial benefit from knowing participation in the allegedly exploitative Mais M[é]dicos program." *Id.* at 216. The district court also rejected PAHO's IOIA immunity regarding the RICO claim to the extent that it rests on the conduct underlying the 1589(b) claim. *Id.* at 223.

The district court also concluded that the WHO Constitution did not render PAHO immune from the second TVPA claim. *Id.* at 227–28. PAHO claimed immunity under a provision that grants the WHO, PAHO's parent organization, "privileges and immunities as may be necessary" to carry out WHO functions. *Id.* at 227; WHO CONST. art. 67(a). The district court ruled that the provision is not self-executing because Article 68 of the WHO Constitution provides that the "privileges and immunities shall be defined in a separate agreement." *Rodriguez*, 502 F. Supp. 3d at 228. Because the United States has not entered into a qualifying "separate

---

[1] Under the commercial activity exception, the challenged action must be "based upon" commercial activity in the United States. 28 U.S.C. § 1605(a)(2). Under Supreme Court precedent interpreting the "activity" an action is "based upon," we look to the "gravamen" thereof. *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015). If the gravamen of PAHO's claim were the forced labor abroad, the commercial activity exception would not apply because the action would not be "based upon" activity "in the United States."

agreement," *id.*, PAHO is without WHO Constitution immunity from suit.[2] PAHO timely appealed.

Pursuant to 28 U.S.C. § 1291 and the collateral-order doctrine, *see de Csepel v. Republic of Hungary*, 859 F.3d 1094, 1109 (D.C. Cir. 2017) (denial of motion to dismiss on sovereign immunity ground is immediately appealable final decision), we have jurisdiction of the second TVPA claim, that is, that PAHO financially benefitted from its participation in a venture that provided or obtained forced labor in violation of § 1589(b).

## II.   ANALYSIS

PAHO asserts its immunity under both the IOIA and the WHO Constitution. Our review is *de novo*. *Zuza v. Off. of the High Representative*, 857 F.3d 935, 938 (D.C. Cir. 2017). "Where, as here, the defendant contests only the legal sufficiency of [the] jurisdictional claims, the standard is similar to that of Rule 12(b)(6), under which dismissal is warranted if no plausible inferences can be drawn from the facts alleged that, if proven, would provide grounds for relief." *Valambhia v. United Republic of Tanzania*, 964 F.3d 1135, 1139 (D.C. Cir. 2020) (internal quotation marks omitted). Because the IOIA "grants international organizations the 'same immunity' from suit 'as is enjoyed by foreign governments' . . . the Foreign Sovereign Immunities Act governs the immunity of international organizations." *Jam*, 139 S. Ct. at 772. Under the FSIA, a foreign sovereign "bears the burden of proving that the plaintiff[s'] allegations do not bring [their] case within a

---

[2]   The district court also rejected other claims not raised on appeal: an immunity claim under the United Nations Charter, *Rodriguez v. Pan Am. Health Org.*, 502 F. Supp. 3d 200, 227 (D.D.C. 2020), an abstention argument based on international comity, *id.* at 229, and an improper service argument, *id.* at 231.

statutory exception to immunity." *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000) (citation omitted). Accordingly, PAHO bears the burden of establishing that no statutory exception to immunity applies. The WHO Constitution is an international treaty and thus its interpretation—including whether it is self-executing—is an issue of law that we also review *de novo*. *McKesson Corp. v. Islamic Republic of Iran*, 539 F.3d 485, 488 (D.C. Cir. 2008).

## A.  IOIA Immunity

The IOIA grants an international organization "the same immunity from suit . . . as is enjoyed by foreign governments." 22 U.S.C. § 288a(b). The IOIA provisions link the immunity of international organizations and foreign governments. *Jam*, 139 S. Ct. at 768. In 1960, President Eisenhower designated PAHO an international organization for IOIA purposes. *Tuck v. PAHO*, 668 F.2d 547, 550 n.5 (D.C. Cir. 1981).

The IOIA, through the FSIA provisions, grants PAHO immunity from suit brought in American courts. 28 U.S.C. § 1604. Under the FSIA's commercial activity exception, however, PAHO loses its immunity if "the action is based upon a commercial activity carried on in the United States by the [international organization]." *Id.* § 1605(a)(2). The Supreme Court has said that courts should look to "the gravamen" of the action when determining whether an action is "based upon" a commercial activity in the United States. *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015). "The gravamen" simply means "the crux" of the action. *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 755 (2017). Unsurprisingly, the parties describe neither the gravamen nor its application under the commercial activity exception in the same way. Their dispute includes whether to identify the

gravamen on a claim-by-claim basis and, further, whether the gravamen took place in the United States.

1. Whether to determine the gravamen on a claim-by-claim basis

PAHO contends that we should look to the entire complaint in determining the gravamen of the action. It notes that the commercial activity exception applies if "*the action* is based upon a commercial activity," 28 U.S.C. § 1605(a)(2) (emphasis added), and argues that "the action" refers to the entire lawsuit. If PAHO is correct, we must consider the entire complaint to determine the "gravamen." *See Sachs*, 577 U.S. at 35 (court looks to "gravamen" in considering whether "an *action* is based upon a commercial activity carried on in the United States" (emphasis added)). In *Sachs*, the Supreme Court interpreted its earlier FSIA holding in *Saudi Arabia v. Nelson*, 507 U.S. 349 (1993). It observed that *Nelson* "did not undertake . . . an exhaustive claim-by-claim, element-by-element analysis of the Nelsons' 16 causes of action" in analyzing the "gravamen." *Sachs*, 577 U.S. at 34. "Rather than individually analyzing each of the Nelsons' causes of action, [the Court] zeroed in on the core of their suit: the Saudi sovereign acts that actually injured them." *Id.* at 35. We read *Sachs*—and 28 U.S.C. § 1605(a)(2)—differently from PAHO.

First, the FSIA text does not require courts to look to the entire lawsuit to determine the gravamen thereof. PAHO relies significantly on the assumption that "action" in 28 U.S.C. § 1605(a)(2) refers to the entire suit. But "action" can refer both to "a . . . judicial proceeding," *Action*, Black's Law Dictionary (11th ed. 2019), and serve as shorthand for a "cause of action," *id.* (referring to "cause of action" entry); *see also Cause of Action*, Black's Law Dictionary (11th ed. 2019) ("group of operative facts giving rise to one or more bases for suing").

And the Supreme Court has stated that "statutory references to an 'action' have not typically been read to mean that every claim included in the action must meet the pertinent [jurisdictional] requirement before the 'action' may proceed." *Jones v. Bock*, 549 U.S. 199, 221 (2007).

Second, *Sachs* instructs courts to define the "gravamen" on a claim-by-claim basis. Earlier, in *Nelson*, the plaintiff had claimed that the commercial activity exception lifted Saudi Arabia's sovereign immunity. 507 U.S. at 355–56. In that case, the Supreme Court read the commercial activity exception to require a court to look to the "elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case" in determining whether an action is "based upon" commercial activity in the United States. *Id.* at 357. After *Nelson*, the Ninth Circuit *Sachs* opinion adopted an "element-by-element" approach under which the commercial activity exception applies if any element of a claim involves a "commercial activity . . . in the United States." *Sachs v. Republic of Austria*, 737 F.3d 584, 599 (9th Cir. 2013) (en banc).[3]

---

[3] Before *Sachs*, circuit courts had interpreted *Nelson* in various ways. Like the Ninth Circuit, the Eighth Circuit read *Nelson* to say that "only one element of a plaintiff's claim must concern commercial activity carried on in the United States." *BP Chems. Ltd. v. Jiangsu Sopo Corp.*, 285 F.3d 677, 682 (8th Cir. 2002). It therefore found that a wrongful disclosure case was "based upon" commercial activity in the United States because the plaintiffs alleged that the defendants disclosed "trade secrets to American vendors in the United States." *Id.* at 684. Indeed, rejecting the "gravamen" theory, the Eighth Circuit held that courts should look beyond the elements only if guarding against a "semantic ploy" like recasting an intentional tort claim as a "facially invalid" failure-to-warn claim. *Id.* at 685–86.

12

In *Sachs*, the Supreme Court rejected that approach. *Sachs*, 507 U.S. at 34. Sachs had purchased a Eurail train pass in the United States and was later injured at a government-owned train station in Austria. *Id.* at 30. She sued Austria's railway operator, relying on the commercial activity exception because an element of her claim—her Eurail purchase—involved "commercial activity . . . in the United States." *Id.* at 30. The Supreme Court clarified that earlier, in *Nelson*, it did not "individually analyz[e] each of the [plaintiffs'] causes of action" because the "Saudi sovereign acts that actually injured them . . . form[ed] the basis for the [plaintiffs'] suit." *Id.* at 35 (quoting *Nelson*, 507 U.S. at 358) (internal quotation marks

---

In our circuit, we read *Nelson* to say that the commercial activity must constitute an *essential* element of the claim. *Kirkham v. Société Air France*, 429 F.3d 288, 292 (D.C. Cir. 2005) ("so long as the alleged commercial activity establishes a fact without which the plaintiff will lose, the commercial activity exception applies"). In *Kirkham*, we explained that the plaintiff "*must* show she purchased a plane ticket in order to establish a passenger-carrier relationship with the airline" and proceed with her negligence claim against Air France. *Id.* The Fourth and Fifth Circuits interpreted *Nelson* similarly. *See Globe Nuclear Servs. & Supply (GNSS), Ltd. v. AO Techsnabexport*, 376 F.3d 282, 287 (4th Cir. 2004) (what plaintiff "will need to prove" constitutes what action is "based upon"); *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 853 (5th Cir. 2000) (inquiry is whether alleged commercial activity is "an essential element of the claims").

The Third Circuit read *Nelson* to "require the actual legal claims being pursued to have arisen materially from the commercial activity undertaken by the foreign state." *Fed. Ins. Co. v. Richard I. Rubin & Co.*, 12 F.3d 1270, 1288 (3d Cir. 1993). It therefore held that tort claims arising from deficient electrical and fire detection systems were not "based upon" a Dutch-controlled entity that invested in American property. *Id.* at 1289. The investments were not "directly connected to the cause of action" or the "'basis' or 'foundation' of the claims." *Id.*

omitted). PAHO argues that the *Sachs* Court, in saying that *Nelson* "did not undertake . . . an exhaustive claim-by-claim, element-by-element analysis of the Nelsons' 16 causes of action," *id.* at 34, instructs us to look to the entire lawsuit to determine whether an action is "based upon" commercial activity in the U.S. But *Sachs* rejected the Ninth Circuit's "one-element" approach and instead reaffirmed its direction to look to the "gravamen" of the suit. Indeed, *Sachs* itself considered individual claims, declaring that "the gravamen of Sachs's suit plainly occurred abroad. All of her *claims* turn on the same tragic episode in Austria." *Id.* (emphasis added). The Court explicitly rejected Sachs's assertion that some of her claims were based upon American activity. *Id.* at 35–36 ("Sachs maintains that some of those claims are not limited to negligent conduct or unsafe conditions in Austria, but rather involve at least some wrongful action in the United States. . . . However Sachs frames her suit, the incident in Innsbruck remains at its foundation."). The Court in fact emphasized its opinion's limited reach, noting it "consider[ed] here only a case in which the gravamen of *each claim* is found in the same place." *Id.* at 36 n.2 (emphasis added). *Sachs*, then, approves considering the "gravamen" on a claim-by-claim basis.

Since *Sachs*, we have considered "FSIA immunity determinations on a claim-by-claim basis." *Simon v. Republic of Hungary*, 812 F.3d 127, 141 (D.C. Cir. 2016) (citing precedent from other circuits), *vacated on other grounds by Federal Republic of Germany v. Philipp*, 141 S. Ct. 703 (2021); *see also Action All. of Senior Citizens of Greater Philadelphia v. Sullivan*, 930 F.2d 77, 83 (D.C. Cir. 1991) (vacated opinions "continue to have precedential weight, and in the absence of contrary authority, we do not disturb them"). In *Simon*, we reviewed claims made by fourteen Holocaust survivors against the Republic of Hungary and its state-owned railway. *Id.* at 132. The survivors "assert[ed] causes of action ranging from

the common law torts of conversion and unjust enrichment for the plaintiffs' property loss, to false imprisonment, torture, and assault for their personal injuries, to international law violations." *Id.* at 134. They argued that FSIA's expropriation exception applied, *id.* at 140*,* which requires, *inter alia*, "that the claims are ones in which 'rights in property' are 'in issue,'" *id.* at 141 (quoting 28 U.S.C. § 1605(a)(3)). We reviewed the causes of action separately, noting that property rights were at issue in the plaintiffs' conversion claims but not in their personal injury claims. *Id.* Although PAHO emphasizes that the commercial activity exception uses "action" (and the expropriation exception does not), we think it unlikely that this implicit word choice differentiates commercial activity exception analysis from that of other FSIA exceptions.

The parties also contest PAHO's alleged delict—whether PAHO "moved money for a fee" (i.e., acting as a financial intermediary) or, instead, arranged medical services for a fee (i.e., acting as an international public health organization). As described *supra*, the complaint alleges that PAHO "moved money for a fee" under the "pretext" of arranging medical services. PAHO, of course, maintains that it in fact organized a public health program. At this stage of the litigation, however, we accept all well-pleaded allegations as true. *Valambhia*, 964 F.3d at 1137. The complaint plainly asserts that, with respect to the funds that constituted its financial benefit in violation of 1589(b), PAHO had the role of financial "intermediary," transferring money among *Mais Médicos* participants.

2. Whether the gravamen occurred in the United States

The parties also dispute how to define the gravamen under the claim-by-claim approach and whether the gravamen constitutes "commercial activity carried on in the United States." PAHO maintains that the "gravamen" is the activity

that in fact injured the physicians, the alleged human trafficking and forced labor. In *Sachs*, the Supreme Court rejected Sachs's argument that, for her failure-to-warn claim, the gravamen occurred in the United States. 577 U.S. at 35–36. "Under any theory of the case that Sachs presents . . . there is nothing wrongful about the sale of the [train] pass standing alone. Without the existence of the unsafe boarding conditions in [Austria], there would have been nothing to warn Sachs about when she bought the [train] pass. However Sachs frames her suit, the incident in [Austria] remains at its foundation." *Id.* Moreover, in *Jam v. International Finance Corporation,* 3 F.4th 405 (D.C. Cir. 2021), we recently applied a similar rationale. The plaintiff alleged that the International Finance Corporation (IFC) negligently lent money to an Indian power-generation project that allegedly caused significant environmental damage. *Id.* at 407. Relying in part on the Supreme Court's earlier decision in the case, *see Jam*, 139 S. Ct. at 779 ("[I]f the 'gravamen' of a lawsuit is tortious activity abroad, the suit is not 'based upon' commercial activity within the meaning of the FSIA's commercial activity exception."), we held that, notwithstanding the IFC loan transaction took place in the United States, the "gravamen" occurred in India because all the allegedly wrongful conduct occurred there. *Jam*, 3 F. 4th at 409.

PAHO asserts that "moving money for a fee" likewise becomes "wrongful" only due to activity that occurred elsewhere—in this instance, alleged human trafficking and forced labor in Cuba and/or Brazil. Absent the alleged trafficking and forced labor, PAHO would have merely acted as a typical financial intermediary. As in *Sachs* and in *Jam*, PAHO argues that we should look to what "actually injured" the physicians in identifying the "gravamen." *See Sachs*, 577 U.S. at 35–36. If PAHO is right, the "gravamen" occurred abroad and the commercial activity exception would not apply.

We think that *Sachs* does not require defining the "gravamen" by looking to the acts that "actually injured" the physicians. In defining the "gravamen" according to the activity that injured the plaintiffs, the *Sachs* Court clarified that "[d]omestic conduct with respect to different types of commercial activity may play a more significant role in other suits." 577 U.S. at 36 n.2; *see also id.* ("Justice Holmes wrote that the 'essentials' of a personal injury narrative will be found at the 'point of contact'—'the place where the boy got his fingers pinched.' *At least in this case*, that insight holds true." (citation omitted) (emphasis added)). *Nelson*, *Sachs* and *Jam* all considered commercial activity connected with tortious activity that occurred abroad. *See Jam*, 139 S. Ct. at 779 ("[I]f the 'gravamen' of a lawsuit is *tortious* activity abroad, the suit is not 'based upon' commercial activity within the meaning of the FSIA's commercial activity exception." (emphasis added)). The Court expressed concern that artful pleading would allow litigants to "recast virtually any claim of intentional tort" as a failure to warn and thus create an exception to sovereign immunity. *Sachs*, 577 U.S. at 36 (quoting *Nelson*, 507 U.S. at 363).[4]

---

[4] Indeed, in *Nelson* and *Sachs*, the Court explained that it looked to the "gravamen" as plaintiffs could otherwise recast nearly any tortious activity that occurred abroad as a tort that occurred in the United States. *See Nelson*, 507 U.S. at 363 ("[A] plaintiff could recast virtually any claim of intentional tort committed by sovereign act as a claim of failure to warn, simply by charging the defendant with an obligation to announce its own tortious propensity before indulging it. To give jurisdictional significance to this feint of language would effectively thwart the [FSIA's] manifest purpose to codify the restrictive theory of foreign sovereign immunity."); *id.* at 358 ("Those torts, and not the arguably commercial activities that preceded their commission, form the basis for the Nelsons' suit."); *Sachs*, 577 U.S. at 36 (iterating *Nelson*'s concern about artful

17

Here, however, the alleged financial activity itself gives rise to a cause of action. *See* 18 U.S.C. § 1589(b) (prohibition on financially benefitting from participation in human trafficking). At least with regard to alleged illegal financial activity, we consider the "gravamen" of *that* alleged wrongful conduct rather than any harm that may result elsewhere. The "gravamen" of a suit consists of "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case," *Nelson*, 507 U.S. at 357, or, phrased differently, "the core" of a claim, *see Sachs*, 577 U.S. at 35. If the conduct is itself wrongful—as opposed to wrongful based only on other conduct—it constitutes the "core" of the claim. The physicians allege that PAHO committed a financial crime in the U.S., *see* 18 U.S.C. § 1589(b), and press the corresponding civil claim, *see* 18 U.S.C. § 1595(a) ("individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator . . . and may recover damages"). The "financial benefit" that violates § 1589(b) is itself "wrongful conduct" and occurred in the United States, to wit: PAHO received, forwarded and retained the *Mais Médicos* money through its Washington, D.C. bank account. Apart from the wrongful conduct PAHO allegedly participated in abroad, the physicians also allege wrongful conduct that occurred entirely within the U.S.[5]

---

pleading of tort claims); *id.* (gravamen occurs abroad if plaintiff suffers "personal injury" abroad and "seeks relief under claims for negligence, strict liability for failure to warn, or breach of implied warranty"); *see also Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 755 (2017) (concern about artful pleading motivated holding in *Sachs*).

[5] Because we define the "gravamen" as it relates to the injury-causing conduct, and not to the resulting injury, we need not address who suffered from the § 1589(b) violation. Even if we did, however, we would reach the same conclusion. Section 1589(a) criminalizes

Accordingly, we believe that the physicians have sufficiently alleged that PAHO's conduct of "moving money for a fee" constituted "commercial activity carried on in the United States." We emphasize, however, that we hold only that the physicians have made sufficient allegations to survive dismissal; the district court retains the authority to reassess its jurisdiction as the litigation progresses. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006) ("subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation"); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (burden of establishing jurisdiction varies "with the manner and degree of evidence required at the successive stages of the litigation").

## B.   WHO Constitution Immunity

PAHO also claims immunity under the WHO Constitution. The WHO Constitution provides that it "shall enjoy in the territory of each Member such privileges and immunities as may be necessary for the fulfillment of its objective and for the exercise of its functions." WHO CONST. art. 67(a). "Such . . . privileges and immunities shall be defined in a separate agreement to be prepared by the Organization in consultation with the Secretary-General of the United Nations

---

the "provid[ing] or obtain[ing of] labor" through force. Under a § 1589(a) claim, the suffered injury is plainly involuntary servitude. By contrast, § 1589(b)—the TVPA subsection claim *sub judice*—criminalizes knowing benefit, financial or otherwise, from participation in a venture that has provided or obtained forced labor. Section 1589(b), like § 1589(a), protects against involuntary servitude. *Cf. Rodriguez*, 502 F. Supp. 3d at 217 (PAHO injured physicians because its financial activity played direct role in harming them). Section 1589(b) also protects commercial entities that decline to benefit from forced labor and may be harmed by competition from products or services garnering implicit subsidies from forced labor.

and concluded between the Members." *Id.* art. 68. We assume *arguendo* that PAHO, the WHO's Regional Office for the Americas, *Agreement Between the World Health Organization and the Pan American Sanitary Organization*, May 24, 1949, also enjoys the immunity granted to the WHO under the WHO Constitution. We nonetheless reject PAHO's immunity claim because the relevant provision of the WHO Constitution is not self-executing.[6]

Although the Supremacy Clause of the United States Constitution guarantees that "all Treaties . . . shall be the supreme Law of the Land," U.S. CONST. art. VI, cl. 2, the Supreme Court has long recognized the "distinction between treaties that automatically have effect as domestic law, and those that—while they constitute international law commitments—do not by themselves function as binding federal law." *Medellin v. Texas*, 552 U.S. 491, 504 (2008). The court must determine whether a treaty has domestic legal effect—that is, whether the treaty is "self-executing." "When [a treaty's] stipulations are not self-executing, they can only be enforced pursuant to legislation to carry them into effect." *Whitney v. Robertson*, 124 U.S. 190, 194 (1888).

To determine whether a treaty is self-executing, the court must "decide whether a treaty's terms reflect a determination by the President who negotiated it and the Senate that confirmed it that the treaty has domestic effect." *Medellin*, 552 U.S. at 521. "The interpretation of a treaty [is] like the

---

[6] The physicians make other arguments challenging PAHO's asserted immunity under the WHO Constitution. They argue that the United States did not adopt the WHO Constitution through proper constitutional procedures and that WHO immunity does not extend to PAHO (WHO's regional affiliate). Because we conclude that Article 67(a) of the WHO Constitution is not self-executing, we do not reach these arguments.

interpretation of a statute." *Id.* at 506. We first look to the treaty's text. *Id.* Because a treaty is "an agreement among sovereign powers, we have traditionally [also] considered as aids to its interpretation the negotiating and drafting history *(travaux préparatoires)* and the postratification understanding of the contracting parties." *Zicherman v. Korean Air Lines Co.*, 516 U.S. 217, 226 (1996); *see also Choctaw Nation of Indians v. United States*, 318 U.S. 423, 431 (1943) (courts "look beyond the written words" more often when interpreting treaty than when interpreting contract). Nonetheless, "[t]he clear import of treaty language controls unless application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories." *United States v. Stuart*, 489 U.S. 353, 365–66 (1989) (quoting *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 180 (1982)) (internal quotation marks omitted).

As made plain by the language of Articles 67(a) and 68 of the WHO Constitution, Article 67(a) is not self-executing. First, Article 67(a) does not provide an enforceable rule-of-decision. If a treaty provision does not contain a judicially manageable rule of decision, the provision is ordinarily not self-executing. *See Diggs v. Richardson*, 555 F.2d 848, 851 (D.C. Cir. 1976) (treaty is not self-executing if it does "not provide specific standards"); *cf. Edye v. Robertson*, 112 U.S. 580, 598–99 (1884) ("A treaty, then, is a law of the land as an act of congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined."). Article 67(a) provides that the WHO enjoys "privileges and immunities . . . necessary for the fulfillment of [the WHO's] objective." That standard is far too general to establish a rule of decision.

Moreover, Article 68 stipulates that the political branches will enforce Article 67(a). *See* WHO CONST. art. 68 (Article 67(a)'s "privileges and immunities shall be defined in a separate agreement to be prepared by the Organization in consultation with the Secretary-General of the United Nations and concluded between the Members"). If treaty language requires a political branch to take future action, courts almost always conclude that the treaty language committed discretion to the political branches and is therefore not self-executing. *See Diggs*, 555 F.2d at 851 (treaty not self-executing if it "call[s] upon governments to take certain action"); *Republic of Marshall Islands v. United States*, 865 F.3d 1187, 1194 (9th Cir. 2017) (treaty provision that "anticipates future action . . . to implement or honor the treaty obligation" is not self-executing); *cf. Medellin*, 552 U.S. at 509 ("The U.N. Charter's provision of an express diplomatic—that is, nonjudicial—remedy is itself evidence that [International Court of Justice] judgments were not meant to be enforceable in domestic courts."). Article 68 states that Article 67(a)'s "privileges and immunities shall be defined in a separate agreement to be prepared by the Organization in consultation with the Secretary-General of the United Nations and concluded between the Members." The WHO Constitution thereby requires members to conclude an agreement defining the privileges and immunities. By adopting the WHO Constitution, the President and the Congress thereby agreed that another agreement is required to define the WHO's privileges and immunities, relieving the courts of the task of defining them.

In response, PAHO relies on Article 67(a)'s mandatory language. *See* WHO CONST. art. 67(a) (WHO "*shall* enjoy . . . such privileges and immunities as may be necessary for the fulfillment of its objective and for the exercise of its functions") (emphasis added). Indeed, if a treaty provision does not include mandatory language like "shall" or "must," that omission

usually indicates that the provision is not self-executing. *Medellin*, 552 U.S. at 508. But "even mandatory language may not be conclusive evidence that a provision is self-executing if the context and treaty objectives indicate otherwise." *Doe v. Holder*, 763 F.3d 251, 255 (2d Cir. 2014). In other words, in determining whether a treaty provision is self-executing, mandatory language is required but not necessarily sufficient.

PAHO also asserts that the U.S. has by implication bound itself to the separate treaty that defines the WHO's "privileges and immunities." In 1947, as provided by Article 68, the United Nations General Assembly approved the Convention on the Privileges and Immunities of the Specialized Agencies (CPISA). *See Convention on the Privileges and Immunities of the Specialized Agencies*, 33 U.N.T.S. 261 (1947) (art. I, § 1(ii)(g) & art. III, § 4). The CPISA grants the WHO immunity from every form of legal process. *Id.* at 264, 266. The United States joined the WHO in 1948, *see Constitution Adopted by the United States of America and Other Governments Respecting a World Health Organization*, June 21, 1948, 62 Stat. 2679, T.I.A.S. No. 1808, one year after the U.N. General Assembly adopted the CPISA. But the United States has never ratified the CPISA.

PAHO contends that the United States "by implication" ratified the CPISA, at least insofar as it defines the "privileges and immunities" of Article 67(a) of the WHO Constitution, when it ratified the WHO Constitution. But the United States did not ratify the CPISA by virtue of the WHO Constitution's provision requiring a subsequent agreement defining "privileges and immunities." Indeed, when the U.S. eventually entered into a corresponding treaty that granted immunity to the U.N.—the Convention on the Privileges and Immunities of the United Nations (CPIUN)—the Senate Report indicates that the political branches had not ratified treaties like the CPISA

because they thought that the IOIA itself provided sufficient immunity to international organizations. S. Exec. Rep. No. 91-17, p. 1, 8, 11, 14 (1970). Moreover, the political branches thought it necessary to ratify the CPIUN—which expanded IOIA immunity in "minor ways," *id.* at 1—even though Articles 105(1) and 105(3) of the U.N. Charter effectively mirror the WHO Constitution's Article 67(a) and Article 68, respectively.[7]

Finally, we note that the United States has submitted an amicus brief affirming that, in its view, WHO Constitution Article 67(a) is not self-executing. "Respect is ordinarily due the reasonable views of the Executive Branch concerning the meaning of an international treaty." *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 168 (1999). The Executive Branch's position reinforces our decision.

For the foregoing reasons, we affirm the district court's judgment denying PAHO's motion to dismiss the 18 U.S.C. § 1589(b) claim and remand for further proceedings consistent with this opinion.

---

[7] *Compare* WHO CONST. art. 67(a) (WHO "shall enjoy in the territory of each Member such privileges and immunities as may be necessary for the fulfillment of its objective and for the exercise of its functions") *and* WHO CONST. art. 68 ("Such . . . privileges and immunities shall be defined in a separate agreement to be prepared by the Organization in consultation with the Secretary-General of the United Nations and concluded between the Members.") *with* U.N. CHARTER art. 105(1) ("The Organization shall enjoy in the territory of each of its Members such privileges and immunities as are necessary for the fulfillment of its purposes.") *and* U.N. CHARTER art. 105(3) ("The General Assembly may make recommendations with a view to determining the details of the application of paragraphs 1 . . . of this Article or may propose conventions to the Members of the United Nations for this purpose.").

*So ordered.*