22-3097-cv

# United States Court of Appeals
## for the Second Circuit

_____

August Term 2023

(Argued: December 13, 2023    Decided: February 4, 2025)

No. 22-3097

_____

THOMAS SCHANSMAN, individually, as surviving parent of Quinn Lucas Schansman, and as the legal guardian on behalf of X.S., a minor; CATHARINA TEUNISSEN, individually and as the surviving parent and personal representative of the Estate of Quinn Lucas Schansman; NERISSA SCHANSMAN, as surviving sibling of Quinn Lucas Schansman; XANDER SCHANSMAN, individually, as a surviving sibling of Quinn Lucas Schansman,

*Plaintiffs-Appellees,*

— v. —

SBERBANK OF RUSSIA PJSC,

*Defendant-Appellant,*

WESTERN UNION COMPANY; WESTERN UNION FINANCIAL SERVICES, INC.; MONEYGRAM INTERNATIONAL, INC.; MONEYGRAM PAYMENT SYSTEMS, INC.; VTB BANK PJSC,

*Defendants.*

_____

1

Before: WALKER, CABRANES, and BIANCO, *Circuit Judges*.

Defendant-Appellant Sberbank of Russia PJSC ("Sberbank") appeals from the decision and order of the United States District Court for the Southern District of New York (Andrew L. Carter, Jr., *Judge*), entered on December 6, 2022, denying Sberbank's motion to dismiss the second amended complaint on foreign sovereign immunity grounds.

Plaintiffs-Appellees ("Plaintiffs") are the surviving relatives of Quinn Lucas Schansman, a passenger aboard Malaysia Airlines Flight 17 ("MH17") who was killed when the plane was shot down over eastern Ukraine by a surface-to-air missile launched from territory controlled by the Russian Federation-backed Donetsk People's Republic ("DPR"). Plaintiffs brought claims against Sberbank, a commercial bank based in Russia, under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 *et seq.*, alleging that Sberbank knowingly provided material support to the DPR by facilitating money transfers from donors to the DPR via correspondent accounts in the United States, and that this material support proximately caused the downing of MH17.

After the suit was filed, the Ministry of Finance of the Russian Federation acquired a majority share in Sberbank. Sberbank moved to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), arguing that it is immune under both the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.*, and the ATA. The district court denied the motion, and Sberbank appealed. For the reasons set forth below, we hold that: (1) Sberbank is presumptively immune under the FSIA; (2) the FSIA's commercial activity exception applies to Sberbank's conduct because the alleged claims are based upon quintessentially commercial activity—facilitating money transfers—that Sberbank carried on in the United States, and thus abrogates Sberbank's sovereign immunity under the FSIA; (3) as a matter of first impression, the ATA's immunity provisions apply not only to agencies, but also to "instrumentalities" of foreign states; and (4) as a matter of first impression, the commercial activity exception of the FSIA applies equally to an action brought under the ATA, and thus similarly abrogates Sberbank's sovereign immunity under the ATA. Accordingly, we **AFFIRM** the

2

order of the district court and **REMAND** for further proceedings consistent with this opinion.

Judge Walker concurs in part and concurs in the judgment in a separate opinion.

> JAY S. AUSLANDER (Natalie Shkolnik and Michael Van Riper, *on the brief*), Wilk Auslander LLP, New York, New York, for Defendant-Appellant.
>
> ANDRIANNA KASTANEK (Lee Wolosky, Jason P. Hipp, and Terri L. Mascherin, *on the brief*), Jenner & Block LLP, New York, New York, and Chicago, Illinois, for Plaintiffs-Appellees.

JOSEPH F. BIANCO, *Circuit Judge*:

Defendant-Appellant Sberbank of Russia PJSC ("Sberbank") appeals from the decision and order of the United States District Court for the Southern District of New York (Andrew L. Carter, Jr., *Judge*), entered on December 6, 2022, denying Sberbank's motion to dismiss the second amended complaint on foreign sovereign immunity grounds.

Plaintiffs-Appellees ("Plaintiffs") are the surviving relatives of Quinn Lucas Schansman, a passenger aboard Malaysia Airlines Flight 17 ("MH17") who was killed when the plane was shot down over eastern Ukraine by a surface-to-air missile launched from territory controlled by the Russian Federation-backed Donetsk People's Republic ("DPR"). Plaintiffs brought claims against Sberbank, a commercial bank based in Russia, under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 *et seq.*, alleging that Sberbank knowingly provided material support to the DPR by facilitating money transfers from donors to the DPR via correspondent accounts in the United States, and that this material support proximately caused the downing of MH17.

After the suit was filed, the Ministry of Finance of the Russian Federation acquired a majority share in Sberbank. Sberbank moved to dismiss for lack of

4

subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), arguing that it is immune under both the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.*, and the ATA. The district court denied the motion, and Sberbank appealed. For the reasons set forth below, we hold that: (1) Sberbank is presumptively immune under the FSIA; (2) the FSIA's commercial activity exception applies to Sberbank's conduct because the alleged claims are based upon quintessentially commercial activity—facilitating money transfers—that Sberbank carried on in the United States, and thus abrogates Sberbank's sovereign immunity under the FSIA; (3) as a matter of first impression, the ATA's immunity provisions apply not only to agencies, but also to "instrumentalities" of foreign states; and (4) as a matter of first impression, the commercial activity exception of the FSIA applies equally to an action brought under the ATA, and thus similarly abrogates Sberbank's sovereign immunity under the ATA. Accordingly, we **AFFIRM** the order of the district court and **REMAND** for further proceedings consistent with this opinion.

# I. BACKGROUND

## A. Factual Background[1]

On July 17, 2014, Quinn Schansman, a dual citizen of the United States and the Netherlands, boarded MH17 from Amsterdam to Kuala Lumpur to join his family on vacation in Indonesia. As the plane traveled over eastern Ukraine, it was shot down by a surface-to-air missile launched from territory forcibly controlled by the DPR, a terrorist group backed by the Russian Federation.[2] All of the passengers died.

---

[1] The factual allegations are taken from Plaintiffs' second amended complaint, and we accept such allegations as true for purposes of our review of the district court's denial of a Rule 12(b)(1) motion. *See Donoghue v. Bulldog Invs. Gen. P'Ship*, 696 F.3d 170, 173 (2d Cir. 2012) ("In conducting *de novo* review of the denial of a Rule 12(b)(1) motion to dismiss for lack of standing, we borrow from the familiar Rule 12(b)(6) standard, construing the complaint in the plaintiff's favor and accepting as true all material factual allegations contained therein.").

[2] As of July 17, 2014, Ukraine had designated the DPR as a terrorist organization and the United States had imposed sanctions on the DPR, but the United States has not designated the DPR as a foreign terrorist organization under 8 U.S.C. § 1189(a)(1). *See* 31 CFR § 589.201 & 589.209; U.S. DEP'T OF THE TREASURY, BLOCKING PROPERTY OF CERTAIN PERSONS CONTRIBUTING TO THE SITUATION IN UKRAINE, https://home.treasury.gov/news/press-releases/jl2572 [https://perma.cc/UA5E-VPTB] (2014).

Plaintiffs, who are family members of Schansman, commenced this suit against Sberbank on April 4, 2019.[3] Sberbank is headquartered in the Russian Federation but has branches worldwide, including, during the timeframe relevant to the second amended complaint, in the United States. During that time, Sberbank also maintained correspondent accounts with banks in New York City to effectuate the transfer of funds in U.S. dollars and advertised those correspondent banking relationships on its website.

Plaintiffs allege that Sberbank provided banking and money transfer services to the DPR, knowing or deliberately indifferent to the fact that the DPR would use those services to finance lethal terrorist acts. Specifically, they allege that the DPR fundraised on social media platforms and other websites and, as part of those efforts, "brazenly" informed donors that they could send money to accounts at Sberbank or bank cards issued by Sberbank. Joint App'x at 102. For instance, in one blog post, the DPR's self-proclaimed governor shared account details to donate to a Sberbank bank card. In another video posted on YouTube,

---

[3] Plaintiffs also named VTB Bank PJSC ("VTB")—another bank headquartered in Russia—and several money transfer institutions in their second amended complaint. Plaintiffs and the money transfer institutions agreed to a resolution of the claims between them. As a result, Plaintiff's claims were voluntarily dismissed. *See* D. Ct. Dkt. No. 366, 432. VTB did not assert a defense under the FSIA or the ATA.

7

the DPR's commander-in-chief held up a piece of paper listing the full account number for that same account at Sberbank.

Plaintiffs allege that funds from DPR supporters in these Sberbank accounts were "essential for [the DPR's] procurement of weapons, ammunition, and other instruments of violence, which the DPR used to intimidate and coerce the Ukrainian government and civilian population, and to acquire and control territory, including the territory from which the DPR launched the missile that brought down the MH17 airplane." Joint App'x at 104–05. Funds raised in these efforts were allegedly used to purchase a wide array of military supplies for the DPR, in part because the DPR itself, as a widely recognized terrorist group, did not maintain a central bank account in its own name. One fundraising group, Save Donbass, requested on its website that "Sberbank cardholders . . . make direct payments to our card number," which it provided; shared reports of transfers to and from its Sberbank accounts in June and July 2014; and, the day before the attack, reported that it had purchased armored vehicles and other supplies for the DPR and its affiliates. Joint App'x at 116. Reflecting on the fundraising operation as a whole, one of the DPR's leading fundraisers described the solicitation of donations from Russian citizens as "perhaps the largest crowdfunding campaign

8

in post-Soviet Russia," claiming that the donations "ensured the survival" of the DPR.  Joint App'x at 108.

According to the second amended complaint, at least some of these fundraising efforts were explicitly directed toward donors who sought to use U.S. dollars.  One fundraiser, for instance, explained that the only way donors could transfer U.S. dollars to it was by routing funds through Sberbank's correspondent account at the Deutsche Bank Trust Company Americas in New York City.  A second fundraiser provided similar instructions for routing U.S.-dollar contributions through Sberbank's Deutsche Bank correspondent account or Sberbank's correspondent account at the Bank of New York Mellon in New York City.  A third fundraiser also provided online instructions for how to donate to a Sberbank account using correspondent accounts at Citibank and JPMorgan Chase Bank.  Yet another fundraiser provided, in an English-language post, its Sberbank account number as "the official account to collect funds."  Joint App'x at 134.  A financial report posted by a DPR-affiliated group on July 4, 2014—thirteen days before Schansman boarded MH17—stated that "citizens from different countries [had] transfer[red] money" to it in "significant amounts."  Joint App'x at 112. According to that report, the DPR-affiliated group used 1,762,690 rubles (at the

9

time, approximately $51,000) to provide cash support and purchase military items for the DPR. More specifically, Plaintiffs have identified two wire transfers on June 9 and July 2, 2014 from individuals residing in Maryland and New Jersey to the DPR using Sberbank's correspondent accounts in New York City.[4]

Plaintiffs allege that "by no later than April 2014," Sberbank "had actual knowledge that [it] was providing material support and financing to the DPR." Joint App'x at 107. In particular, they point to articles from that month in *Forbes*, *Reuters*, and the *Kyiv Post* that specifically named Sberbank as one of the intermediaries being used to fund the DPR's violence. One article stated that Sberbank was conducting an internal investigation into the allegations of terrorist financing, and another stated that Sberbank had contacted Ukrainian officials to discuss the allegations, making clear that Sberbank was aware of the reports. Following the July 17, 2014 attack on MH17, the U.S. Department of the Treasury imposed sanctions on Sberbank because of its financial assistance to the DPR. Still, Sberbank allegedly continued to allow donors to use its correspondent accounts in New York City to provide funds to the DPR for some time thereafter.

---

[4] These two transfers totaled $300. Plaintiffs expect the completion of discovery to reveal additional transfers.

## B. Procedural History

Plaintiffs filed their initial complaint on April 4, 2019, an amended complaint on October 8, 2019, and the operative second amended complaint on October 5, 2020. When Plaintiffs filed their initial complaint, the Central Bank of the Russian Federation owned a majority stake of Sberbank's total authorized capital. On April 30, 2020, the Ministry of Finance of the Russian Federation acquired that majority stake.[5]

In the second amended complaint, Plaintiffs allege that Sberbank provided material support and financing to the DPR by, *inter alia*, maintaining correspondent accounts in New York and allowing transfers to a specific Sberbank bank card that were then used to procure lethal weapons for the DPR. Sberbank moved to dismiss the second amended complaint on the grounds that the court lacked personal jurisdiction over it and that the complaint failed to state a claim

---

[5] Sberbank moved to dismiss the initial complaint and the first amended complaint. In its briefing in support of those motions to dismiss, Sberbank disclaimed that it was an instrumentality of the Russian Federation. *See* D. Ct. Dkt. No. 98 at 21 n.6 (noting in its memorandum in support of its motion to dismiss the initial complaint that "Plaintiffs also allege Sberbank is directly majority-owned by the Russian Federation . . . apparently in an attempt to assert Sberbank is an instrumentality of Russia. If these false allegations were true, dismissal would be mandated for lack of subject matter jurisdiction over Sberbank as an instrumentality."); D. Ct. Dkt. No. 115 at 21 (same, in memorandum in support of motion to dismiss first amended complaint). These motions were mooted by Plaintiffs' amendments.

under the ATA.[6]  The district court denied the motion to dismiss the second amended complaint (and later denied Sberbank's motion for reconsideration).

On November 17, 2021, Sberbank filed its answer to Plaintiffs' second amended complaint.  In its answer, Sberbank, for the first time, objected to the district court's subject matter jurisdiction under the FSIA, arguing that because Sberbank is majority-owned by the Russian Federation, it is an agency or instrumentality of a foreign state.  On December 30, 2021, with the district court's permission, Sberbank moved to dismiss the second amended complaint, pursuant to Rule 12(b)(1), for lack of subject matter jurisdiction under the FSIA and the ATA. That motion is the subject of the instant appeal.  In its memorandum in support of that motion, Sberbank argued that its current ownership by the Russian Ministry of Finance entitles it to a presumption of immunity as an agency or instrumentality and that the commercial activity exception does not apply.  In addition, Sberbank argued that, even if FSIA immunity was determined at the time Plaintiffs filed their initial complaint, Sberbank is nonetheless immune because its then-majority owner was the Central Bank of the Russian Federation, which Sberbank contends

---

[6] In its motion to dismiss, Sberbank again denied that it was an instrumentality of the Russian Federation—its first such denial following the acquisition of a majority stake by the Russian Ministry of Finance.

12

is a political subdivision of the Russian Federation. Thus, according to Sberbank, it was still an agency or instrumentality of a foreign state or political subdivision thereof under the FSIA. Sberbank further argued that the ATA barred claims against Sberbank regardless of when Sberbank acquired its agency or instrumentality status.

In March 2022, the district court ordered jurisdictional discovery, granting Plaintiffs' request for discovery related to "[t]he degree of independence the Central Bank of the Russian Federation . . . enjoys vis-à-vis the Russian Federation and the Federation's agencies of state power." D. Ct. Dkt. Nos. 291, 298.[7] On November 18, 2022, the parties reported that Sberbank had produced certain documents but that they remained at an impasse regarding the scope of and timeline for discovery on that issue.

### C. District Court Decision

On December 6, 2022, with the discovery dispute pending, the district court issued a written order denying the motion to dismiss under Rule 12(b)(1). *See*

---

[7] The district court denied discovery for documents related to whether the Russian Central Bank's core functions are predominantly governmental or commercial in nature, and documents related to the extent that Sberbank's commercial activity was used to commit unlawful acts.

*generally Schansman v. Sberbank of Russia PJSC*, No. 19-CV-02985 (ALC) (GWG), 2022 WL 17540666 (S.D.N.Y. Dec. 6, 2022). As an initial matter, the district court declined to consider the issue of whether Sberbank had waived its sovereign immunity defense by failing to assert it at earlier stages of the briefing, noting that Sberbank did raise the defense in its answer to the second amended complaint.

The district court then concluded, based on its reading of *Dole Food Co. v. Patrickson*, 538 U.S. 468, 478 (2003), and *Abrams v. Société Nationale Des Chemins De Fer Francais*, 389 F.3d 61, 64 (2d Cir. 2004), that the determination of whether Sberbank is an agency or instrumentality of a foreign state that is presumptively immune under the FSIA is based on Sberbank's status at the time of the filing of the suit—that is, when its majority owner was the Central Bank of the Russian Federation. Applying the core functions test we articulated in *Garb v. Republic of Poland*, 440 F.3d 579 (2d Cir. 2006), the district court concluded that the Central Bank qualified as a political subdivision of the Russian Federation because its core functions were predominantly governmental, not commercial. Specifically, the district court found the Central Bank to be "a crucial market regulator within the Russian [s]ystem. The Constitution of the Russian Federation states that the [Central Bank] is 'exclusively' responsible for the issuance of rubles, and that

14

'protecting and ensuring the stability of the ruble shall be the core function of the Central Bank of the Russian Federation.'"  *Schansman*, 2022 WL 17540666, at \*4 (quoting Art. 75 of the Constitution of the Russian Federation and D. Ct. Dkt. No. 260 at 20 (Declaration of Lyudmila Efimova)).  The district court accordingly held that Sberbank was an agency or instrumentality of the Russian Federation, making it presumptively immune from suit under the FSIA.

However, the district court concluded that Sberbank was nonetheless subject to the commercial activity exception to the FSIA because the gravamen of the suit—Sberbank's "provi[sion of] material support and financing to the DPR, in part by operating correspondent accounts in New York"—concerned commercial activity Sberbank carried on in the United States.  *Id.* at \*5 (citation omitted). Looking "to the nature of the . . . act, rather than . . . to its purpose," 28 U.S.C. § 1603(d), the district court determined that in these circumstances, the "use of correspondent accounts and authorization of money transfers is classic commercial behavior for an international bank and does not qualify as sovereign conduct," *Schansman*, 2022 WL 17540666, at \*5.

Lastly, the district court declined Sberbank's invitation "to read the ATA's sovereign immunity provision more broadly than the FSIA."  *Id.* at \*6.  Relying,

15

*inter alia*, on the Supreme Court's guidance in *Republic of Austria v. Altmann*, 541 U.S. 677, 691 (2004), that "courts should decide claims of sovereign immunity in conformity with [the FSIA's] principles," the district court concluded that sovereign immunity assertions under the ATA are "functionally equivalent" to those under the FSIA and thus, for the same reasons, denied sovereign immunity under the ATA. *Schansman*, 2022 WL 17540666, at *6 (quoting *Republic of Austria*, 541 U.S. at 691; *Ungar v. Palestinian Liberation Org.*, 402 F.3d 274, 283 (1st Cir. 2005)).

## II. DISCUSSION

We are presented with four issues on appeal. The first is whether Sberbank is presumptively immune under the FSIA, either because it was majority-owned by the Russian Central Bank when this action commenced or because a majority stake has since been acquired by the Russian Ministry of Finance. If Sberbank is presumptively immune under the FSIA, the second issue is whether the FSIA's commercial activity exception applies to the suit. If the FSIA does not shield Sberbank, the third issue is whether Sberbank is presumptively immune under the provision of the ATA that immunizes foreign states and agencies from actions brought under the ATA. If Sberbank is presumptively immune under the ATA, the fourth and final issue is whether the FSIA's commercial activity exception

applies to an action brought under the ATA. We review these questions of law *de novo*. *Peterson Energía Inversora S.A.U. v. Argentine Republic & YPF S.A.*, 895 F.3d 194, 203 (2d Cir. 2018) ("We review *de novo* a district court's legal determinations regarding its subject matter jurisdiction, such as whether sovereign immunity exists, and its factual determinations for clear error." (internal quotation marks and citation omitted)).

### A. Presumptive Immunity under the FSIA and Sberbank's Post-Filing Acquisition by the Russian Ministry of Finance

Section 1603(a) of the FSIA provides presumptive immunity for a "foreign state," which includes "an agency or instrumentality of a foreign state." 28 U.S.C. § 1603 (the "FSIA Definitional Provision"). As relevant here, the FSIA defines an "[a]gency or instrumentality of a foreign state" as "[a]ny entity . . . which is a separate legal person . . . and . . . is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof." 28 U.S.C. § 1603(b).

The parties agree that the majority of Sberbank's shares were owned by the Central Bank of the Russian Federation when the action was filed, but since April 30, 2020, the Ministry of Finance of the Russian Federation has owned the majority of Sberbank's shares. Therefore, as a threshold matter, we must address

which owner is the relevant entity for our analysis under Section 1603(b)—that is, whether Sberbank's status as an agency or instrumentality of a foreign state is determined only at the time of the action's initial filing, or whether a post-filing change in ownership may impact the district court's jurisdiction.

Plaintiffs, relying primarily on *Dole Food*, initially argued on appeal that an entity's status as an agency or instrumentality must be determined at the time an action is filed. Therefore our analysis would be limited to whether the Central Bank is a foreign state or political subdivision thereof under the FSIA. In *Dole Food*, the Supreme Court held that federal removal jurisdiction under Section 1441(d) of the FSIA should be determined "at the time suit is filed" rather than "at the time of the conduct giving rise to the suit." 538 U.S. at 478–79. Sberbank argues that *Dole Food*'s holding does not apply to "subsequent developments" that confer immunity, such as a post-filing acquisition. Appellant's Br. at 12.

After the filing of the parties' briefs, but before oral argument, this Court squarely decided this issue in another case. In *Bartlett v. Baasiri*, we addressed "whether [the defendant] may raise a defense of immunity under [the FSIA] . . . when it alleges that immunity arose after suit was filed." 81 F.4th 28, 31 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 1456 (2024) (internal citation omitted). We held that

18

the "most natural reading of the statute is one that gives foreign sovereigns immunity even when they gain their sovereign status mid-suit," reasoning that the statute's use of the present tense provides "*present* protection from the inconvenience of suit as a gesture of comity." *Id.* at 33 (internal quotation marks and citation omitted). In reaching this conclusion, we also noted that foreign states' immunity under the FSIA is "not only from judgments, but from process," that the Supreme Court has instructed that immunity depends on "current political realities," and that this result is consistent with the common-law approach that the FSIA codified. *Id.* at 33–34. Thus, we held that immunity under the FSIA "may attach when a defendant becomes an instrumentality of a foreign sovereign after a suit is filed."[8] *Id.* at 30.

Although we noted the plaintiffs' concern that "allowing post-filing changes in sovereign status will encourage gamesmanship," we found "[t]hose concerns . . . absent" in *Bartlett*. *Id.* at 36–37. In particular, we distinguished *TIG Insurance Co. v. Republic of Argentina*, 967 F.3d 778, 780–82 (D.C. Cir. 2020), in which

---

[8] In so holding, we agreed with the view of the U.S. Department of State, expressed in its amicus brief, that "an entity that becomes an agency or instrumentality of a foreign state within the meaning of the FSIA during the pendency of litigation is entitled to immunity under that statute, subject to the act's enumerated exceptions." Brief for the United States as Amicus Curiae, *Bartlett v. Baasiri*, 81 F.4th 28 (2d Cir. 2023) (No. 21-2019), 2023 WL 4196930, at *5.

Argentina sought to prevent attachment of a property in the District of Columbia. Argentina had offered the property for sale and then, after a creditor sought to attach it under Section 1610(a), promptly removed the property from the market. *Id.* Confronted with those facts, the D.C. Circuit adopted a "time of filing" rule for purposes of determining sovereign immunity in an attachment action under that section, to avoid the risk of "manipulation" that would follow if "a foreign sovereign unilaterally [could] thwart an otherwise valid attachment simply by removing property from the market." *Id.* at 785. We concluded that this risk was not present in *Bartlett* because the defendant bank's change in ownership was the result of its liquidation and subsequent public receivership after being designated by the U.S. government as a terrorist organization, and "not any attempt by [the foreign state] to avoid th[e] lawsuit." 81 F.4th at 37.

Plaintiffs acknowledge that *Bartlett* "is inconsistent with the argument that instrumentality status must be determined at the time of filing." D. Ct. Dkt. No. 74 at 1. Nevertheless, they assert that, unlike in *Bartlett*, "the record here reflects . . . gamesmanship." *Id.* They allege that Sberbank's "status is the product of Russia manufacturing a change in ownership," pointing to the Ministry of Finance's mid-litigation acquisition of a fifty-percent equity stake plus one share in

20

Sberbank, "precisely the amount needed to make [Sberbank] a FSIA instrumentality and engineer a sovereign immunity defense." *Id.* at 1–2. Plaintiffs thus request that we either "hold that *Bartlett* does not extend to such strategic acquisitions," or "remand for further factual development as to gamesmanship." *Id.* at 2. We decline to do so. This conclusory assertion of "gamesmanship" is insufficient, under *Bartlett*, to overcome Sberbank's change in ownership status solely because it occurred after the lawsuit was filed. We similarly reject Plaintiffs' request that we remand for further development of the record on the "gamesmanship" issue, especially where no such request for discovery on that issue was ever made in the district court. *See Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 252–53 (2d Cir. 2017) ("It is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal."). In short, *Bartlett* governs here, and we consider Sberbank's current ownership by the Russian Ministry of Finance, rather than its ownership at the time of filing, for purposes of our analysis under the FSIA.

Here, there is no dispute that the Ministry of Finance is a political subdivision of the Russian Federation, a foreign state. As explained *supra*, Section 1603(b)(1)–(2) defines an agency or instrumentality of a foreign state

21

presumptively entitled to immunity as a "separate legal person, corporate or otherwise, . . . a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof." Because the Russian Ministry of Finance owns a majority of the shares of Sberbank and Sberbank is a "separate legal person," Sberbank is an agency or instrumentality of a foreign state as defined in Section 1603. Thus, Sberbank is presumptively immune under the FSIA.

## B. Application of the FSIA's Commercial Activity Exception to Sberbank's Alleged Conduct

Plaintiffs argue that, even if Sberbank is presumptively immune under the FSIA, the FSIA's exception for commercial activity applies. *See* 28 U.S.C § 1605(a)(2). They contend that Sberbank's provision of material support and financing to the DPR through commercial banking services to private customers, using correspondent accounts in New York City, constitutes commercial conduct in the United States, abrogating sovereign immunity. We agree.

Before 1976, when the FSIA was enacted, the courts had come to defer to the positions of the Executive in determining whether to afford immunity to foreign states. *See* H.R. Rep. No. 94-1487; *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983). In reaching those decisions, beginning in 1952, the U.S. Department of State announced in the Tate Letter that it would begin to "follow

22

the 'restrictive' theory of foreign sovereign immunity in advising courts whether they should take jurisdiction in any given case." *Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 208 (2018). That theory cabins immunity "to suits involving the foreign sovereign's public acts," as opposed "to cases arising out of a foreign state's strictly commercial acts," which are not immune. *Verlinden*, 461 U.S. at 487. Congress's purpose in enacting the FSIA was "to endorse and codify the restrictive theory of sovereign immunity," while shifting the responsibility for deciding immunity claims from the Executive to the courts. *Samantar v. Yousuf*, 560 U.S. 305, 313 (2010) (citing 28 U.S.C. § 1602); *see also Bartlett*, 81 F.4th at 32.

Codifying the restrictive theory of sovereign immunity, the commercial activity exception provides that a foreign state "shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the action is based upon a commercial activity carried on in the United States by the foreign state." 28 U.S.C § 1605(a)(2). "Commercial activity" is defined as "either a regular course of commercial conduct or a particular commercial transaction or act." *Id.* § 1603(d). The "commercial character" of a defendant's conduct, transaction, or act is determined "by reference to the nature of the course

of conduct or particular transaction or act, rather than by reference to its purpose."

*Id.*

"[A] state engages in commercial activity . . . where it exercises 'only those powers that can also be exercised by private citizens,' as distinct from those 'powers peculiar to sovereigns.'" *Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993) (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992)). In other words, it engages in commercial activity when it "acts, not as a regulator of a market, but in the manner of a private player within it." *Anglo-Iberia Underwriting Mgmt. v. P.T. Jamsostek*, 600 F.3d 171, 176 (2d Cir. 2010) (quoting *Weltover*, 504 U.S. at 614). It is thus the "nature of the course of conduct or particular transaction," not that action's "purpose," that determines commercial character. 28 U.S.C § 1603(d). "As this Court has recognized, however, that 'is a standard more easily stated than applied, . . . and its application may sometimes depend on the level of generality at which the conduct is viewed." *Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 134 (2d Cir. 2022) (quoting *Pablo Star Ltd. v. Welsh Gov't*, 961 F.3d 555, 561 (2d Cir. 2020)).

In *Daou*, for example, we held that a defendant, the central bank of Lebanon, "engaged in at least one course of commercial activity: allowing . . . [c]ommercial

24

[b]anks to open checking accounts, which the [c]ommercial [b]anks then used to write checks to [plaintiffs], and then denying requests by banks in the United States to transfer the funds upon deposit of those checks. That is the sort of activity in which any commercial bank could engage." *Id.* The activity at issue here—using correspondent accounts and authorizing money transfers—is of the same kind.

The commercial activity exception, however, only applies where the action is "based upon" the commercial activity in question. § 1605(a)(2). "[A]n action is 'based upon' the 'particular conduct' that constitutes the 'gravamen' of the suit." *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015) (quoting *Nelson*, 507 U.S. at 356–58). In *Nelson*, for instance, a case involving personal injury claims against the Saudi government by an American doctor who was employed at a Saudi government-owned hospital and detained and tortured for reporting safety hazards in that hospital, the Supreme Court held that the action was not "based upon" the commercial activity of recruiting and hiring the doctor because the "gravamen" of his suit was his detention and torture, not his recruitment and hiring. 507 U.S. at 356–63.

When assessing the "gravamen" of a suit, we need "not undertake . . . an exhaustive claim-by-claim, element-by-element analysis" of each cause of action; instead, we "zero[] in on the core of the[] suit." *Sachs*, 577 U.S. at 34–35. Applying this approach to *Sachs*, the Court declared that "the gravamen of Sachs's suit"— injuries she suffered at a government-owned train station in Innsbruck, Austria— "plainly occurred abroad. All of her *claims* turn on the same tragic episode in Austria." *Id.* (emphasis added). The Court explicitly rejected Sachs's assertion that some of her claims were "based upon" commercial activity in the United States because her Eurail purchase involved "commercial activity . . . in the United States." *Id.* at 30, 35–36 ("Sachs maintains that some of those claims are not limited to negligent conduct or unsafe conditions in Austria, but rather involve at least some wrongful action in the United States. . . . However Sachs frames her suit, the incident in Innsbruck remains at its foundation."). The Court emphasized its opinion's limited reach, noting it "consider[ed] here only a case in which the gravamen of each claim is found in the same place." *Id.* at 36 n.2.

Sberbank argues that the gravamen of Plaintiffs' claims is the DPR's attack on MH17 because that is the conduct that actually injured Plaintiffs. We disagree. Here, the gravamen of their claims is Sberbank's alleged use of correspondent

26

accounts and authorization of money transfers in the United States to the DPR and its affiliate groups. In other words, Sberbank's commercial activity—its alleged material support to the DPR in the form of payment facilitation—is the specific unlawful conduct that forms the basis of this particular suit, and the attack on MH17 is, as Plaintiffs describe it, merely the "activity's downstream consequence[]." Appellees' Br. at 44.

Our conclusion is consistent with the D.C. Circuit's analysis in *Rodriguez v. Pan American Health Organization*, 29 F.4th 706 (D.C. Cir. 2022). *Rodriguez* was an action brought by a group of Cuban physicians who alleged that Cuba had forced them, without their consent, to participate in Brazil's "*Mais Médicos*" (*i.e.*, "More Doctors") program to provide medical services to impoverished Brazilians. *Id.* at 709. The physicians filed suit against the Pan American Health Organization ("PAHO") for facilitating the program, including, *inter alia*, serving as a financial intermediary between Brazil and Cuba. *Id.* According to the physicians, PAHO's role included moving money, for a fee, between Brazil and Cuba, which sought to avoid a direct intergovernmental agreement because doing so would have required the approval of the Brazilian Congress. *Id.* at 709–10. Under this arrangement, Brazil made payments to PAHO's Citibank account in the District of

27

Columbia.  *Id.*  PAHO then forwarded 85% to Cuba, paid 10% to the physicians, and retained 5% for its services.  *Id.*  PAHO, like Sberbank, asserted that "moving money for a fee" only became "wrongful" due to activity that occurred elsewhere—in that instance, alleged human trafficking and forced labor in Cuba and Brazil.  *Id.* at 715.  According to PAHO, absent the alleged trafficking and forced labor, PAHO would have merely acted as a typical financial intermediary. *Id.*

The D.C. Circuit rejected PAHO's argument and concluded that the alleged financial activity itself gave rise to a cause of action—the prohibition on financially benefitting from participation in human trafficking.  *Id.* at 716.  It held:

> At least with regard to alleged illegal financial activity, we consider the "gravamen" of *that* alleged wrongful conduct rather than any harm that may result elsewhere.  The "gravamen" of a suit consists of "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case," or, phrased differently, "the core" of a claim.  If the conduct is itself wrongful—as opposed to wrongful based only on other conduct—it constitutes the "core" of the claim.

*Id.* (emphasis in original) (quoting *Nelson*, 507 U.S. at 357, and *Sachs*, 557 U.S. at 35).  The D.C. Circuit concluded that because the physicians alleged that PAHO committed a financial crime in the United States, the "financial benefit" was itself "wrongful conduct" occurring in the United States.  *Id.*  It further explained that

28

the "financial benefit" that occurred in the United States was that "PAHO received, forwarded and retained the *Mais Médicos* money through its Washington, D.C. bank account." *Id.* Accordingly, it concluded that PAHO's conduct of "moving money for a fee" constituted "commercial activity carried on in the United States." *Id.* at 717.

Sberbank argues that "[u]nlike in *Rodriguez*, where the defendant's alleged crime accrued the moment it received the completed funds transfers at its own bank account in the United States, here the alleged predicate crimes and ATA cause of action cannot have accrued until the[] . . . DPR supporters received . . . funds in their overseas accounts with Sberbank's alleged knowledge. Even focusing on the 'act of international terrorism,' Plaintiffs' claims are based on alleged overseas activity." Reply Br. at 26. We are unpersuaded. To be sure, the mere delivery of funds into and out of Sberbank's accounts in New York City does not, standing alone, constitute wrongful conduct that would subject Sberbank to liability. However, if Sberbank, as Plaintiffs allege, transferred funds from U.S.-based accounts to overseas accounts affiliated with the DPR, knowing that the DPR perpetrated acts of terrorism, such conduct plausibly falls within the ambit of the ATA's prohibitions on financing terrorism. *See* 18 U.S.C. §§ 2339A, 2339C.

Here, like in *Rodriguez*, Plaintiffs allege Sberbank committed a financial crime—transferring funds to groups engaged in terrorist activity—and that the wrongful conduct occurred in the United States.

Sberbank contends, however, that the "only evidence of transfers to the DPR through Sberbank's U.S. correspondent accounts consists of bank records purporting to establish two transfers totaling $300." Appellant's Br. at 55. Sberbank argues that Plaintiffs do not allege that the $300 transferred "actually allowed" the DPR to acquire the arsenal of military equipment that it used to capture Ukrainian territory and, ultimately, shoot down MH17 using a surface-to-air missile. *Id.* In sum, according to Sberbank, "[t]hose two transfers . . . cannot possibly constitute the 'core' of the lawsuit." *Id.* at 56.

We disagree. As alleged in the second amended complaint, Sberbank's commercial activity of facilitating transfers in the United States to the DPR and its affiliated groups with either knowledge of or deliberate indifference to the DPR's perpetration of terrorism is what this lawsuit is "based upon." *See Rodriguez*, 29 F.4th at 716–17. In particular, Sberbank's summary of the claims understates Plaintiffs' allegations regarding the DPR's large-scale international crowdfunding effort. As Plaintiffs argue, the two transfers discussed in the second amended

30

complaint are merely identified as non-exhaustive examples, and Plaintiffs have not had the benefit of meaningful discovery. Beyond those two transfers, Plaintiffs allege that multiple DPR fundraisers provided information for donors to donate U.S. dollars using Sberbank's correspondent accounts at four banks in the United States, and, less than two weeks before the MH17 attack, a DPR-affiliated group publicly reported that it had raised "significant amounts" from donors in multiple countries, much of which it had used to provide cash support to, and purchase military equipment for, the DPR. Plaintiffs also allege, based on multiple press reports, that Sberbank had learned of this extensive fundraising effort by April 2014 and failed to stop it. Although Plaintiffs' particular injury—much like the physicians' alleged human trafficking in *Rodriguez*—would not have occurred absent the act of a third party abroad, Sberbank's wrongful conduct of providing material support to the DPR in the United States nonetheless is the gravamen of this suit. *See* 29 F.4th at 717. Accordingly, we hold that the commercial activity exception applies here to abrogate Sberbank's sovereign immunity under the FSIA.

### C. Presumptive Immunity under the ATA

Because we hold that Sberbank is not shielded by sovereign immunity under the FSIA, we now turn to its novel argument that the ATA provides it with immunity where the FSIA does not. Specifically, Sberbank argues that it is also immune under the ATA, and that a cause of action brought under the ATA is not subject to the FSIA's commercial activity exception. We first address its argument that it is presumptively immune under the ATA. Then, we turn to its argument that the commercial activity exception does not apply in this ATA action.

In 1992, sixteen years after Congress enacted the FSIA, it passed the "core provisions" of the ATA. *See Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 75 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 83 (2023) (citing Pub. L. No. 102-572, § 1003, 106 Stat. 4521–24 (1992), codified at 18 U.S.C. §§ 2331–2338). These provisions include Section 2333(a) of the ATA (the "ATA Cause of Action"), which creates a civil remedy for those injured "by reason of an act of international terrorism," and which provides the legal basis for Plaintiffs' cause of action here. In addition, the ATA provides that no claim under Section 2333 may proceed against "a foreign state, an agency of a foreign state, or an officer or employee of a foreign state or an

agency thereof."  18 U.S.C. § 2337(2) (the "ATA Immunity Provision").[9]  Unlike the FSIA, the ATA provides no further explanation of what a "foreign state" includes.

Sberbank argues that the FSIA Definitional Provision should be applied to the ATA Immunity Provision's reference to "a foreign state."  Sberbank suggests that "[a]lthough the ATA immunizes 'foreign state[s],' it does not separately define that term," while, in contrast, the FSIA defines that term in "meticulous[]" detail.  Appellant's Br. at 21.  Accordingly, Sberbank argues, we should treat the FSIA Definitional Provision as a guiding provision that the ATA Immunity Provision merely incorporates by reference.  In other words, Sberbank would have us read the term "foreign state" in the ATA Immunity Provision as referring to the FSIA Definitional Provision, under which Sberbank, as an instrumentality of the Russian Federation, would be presumptively immune.

Plaintiffs, however, contend that the ATA Immunity Provision is narrower than the FSIA Definitional Provision and should therefore be given independent meaning.  They point to the ATA's text, which "immunizes a 'foreign state' and its 'agenc[ies],'" but does not mention instrumentalities.  Appellees' Br. at 34 (quoting § 2337).  In contrast, they note the FSIA Definitional Provision covers "an agency

---

[9]  The ATA Immunity Provision is subject to an express exception at 28 U.S.C. § 1605B(c), discussed *infra*.

*or instrumentality* of a foreign state." 28 U.S.C. § 1603(a) (emphasis added).

Plaintiffs suggest that if the term "foreign state" has the same meaning under the FSIA and the ATA, then the inclusion of "an agency of a foreign state" in the ATA Immunity Provision would be superfluous, because the term "foreign state" in the FSIA already incorporates agencies. Additionally, Plaintiffs argue that the description of "foreign state" in the FSIA is limited to that statute because FSIA Section 1603(a) describes "foreign state" only "[f]or purposes of [Chapter 97]." Appellees' Br. at 34 (quoting 28 U.S.C. § 1603). The ATA is not a part of Chapter 97; thus, according to Plaintiffs, the FSIA Definitional Provision does not apply to the ATA.

Sberbank argues that a later amendment to the FSIA and the ATA provides further support for its proposed construction. In 2016, Congress amended the FSIA and the ATA with the Justice Against Sponsors of Terrorism Act ("JASTA"). As relevant here, the JASTA amendments added (1) a new provision to the FSIA, codified at 28 U.S.C. § 1605B (the "FSIA JASTA Amendment"), and (2) a new provision to the ATA, codified at 18 U.S.C. § 2333(d)(2) (the "ATA JASTA Amendment"). *See* Pub. L. No. 114-222, 130 Stat. at 852–56; *see also Freeman*, 57 F.4th at 75. The FSIA JASTA Amendment expressly abrogated the blanket

sovereign immunity of the ATA, providing that "[n]otwithstanding [the ATA Immunity Provision], a national of the United States may bring a claim against a foreign state in accordance with [the ATA Cause of Action] if the foreign state would not be immune under subsection (b)."[10] 28 U.S.C. § 1605B; *see also* Pub. L. 114-222, 130 Stat. 852 (2016).

Sberbank argues this use of the term "foreign state" demonstrates that the ATA, FSIA, and JASTA define the term identically to one another, and that its definition includes instrumentalities. Appellant's Br. at 25 (**"**JASTA, moreover, . . . *must* use the same definition of 'foreign state' as the ATA, because the JASTA exception expressly refers to and partially repeals the immunity of a 'foreign state' under the ATA, and the Supreme Court 'does not lightly assume that Congress silently attaches different meanings to the same term in the same or related statutes.'" (quoting *Azar v. Allina Health Servs.*, 587 U.S. 566, 574 (2019))). In response, Plaintiffs argue that the FSIA JASTA Amendment shows that if Congress had wanted to expressly incorporate the FSIA Definitional Provision, it would have.

---

[10] Subsection (b), in turn, specifically abrogated immunity for certain injuries "occurring in the United States and caused by . . . an act of international terrorism in the United States." 28 U.S.C. § 1605B(b).

The narrow question of whether the ATA Immunity Provision for foreign states excludes instrumentalities that the FSIA Definitional Provision would otherwise cover is an issue of first impression in this Court. However, the Supreme Court, in cases both before and after the enactment of the ATA, has explained clearly that the FSIA governs all sovereign immunity determinations in civil cases. In *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989), the Supreme Court considered a claim brought under the Alien Tort Statute ("ATS") based on the alleged bombing of the plaintiffs' oil tanker by Argentina during the Falkland Islands war, in violation of international law. Rejecting Argentina's claim of sovereign immunity based on the FSIA, this Court held that the ATS provided "a jurisdictional grant based on international law" independent of the FSIA and that Congress did not intend for the FSIA to disturb "existing remedies in United States courts [under the ATS] for violations of international law." *Amerada Hess Shipping Corp. v. Argentine Republic*, 830 F.2d 421, 425–26 (2d Cir. 1987).

The Supreme Court reversed. Noting "the comprehensiveness of the statutory scheme in the FSIA," it held that "the FSIA provides the sole basis for obtaining jurisdiction over a foreign state in federal court." *Argentine Republic*, 488

U.S. at 437, 439; *see also Nelson*, 507 U.S. at 355. First, it observed that the statutory structure—the FSIA created a new chapter 97 to Title 28, entitled "Jurisdictional Immunities of Foreign States"—indicates that the FSIA is the relevant statute with respect to foreign state immunity in civil cases. *Argentine Republic*, 488 U.S. at 434. Second, it pointed to Congress's provisions in the text of the FSIA. It noted, *inter alia*, that the FSIA itself provides that "[c]laims of foreign states to immunity should *henceforth* be decided by courts of the United States in conformity with the principles set forth in this chapter." *Id.* at 437 (emphasis added in *Amerada Hess*) (quoting 28 U.S.C. § 1602). It also cited the House and Senate Reports, which explained that the FSIA was "intended to preempt any other State and Federal law (excluding applicable international agreements) for according immunity to foreign sovereigns." *Id.* at 438 (quoting H.R. Rep. No. 94–1487, at 12 (1976); S. Rep. No. 94–1310, at 11 (1976)). In the Supreme Court's view, Congress "very likely . . . thought that should be sufficient." *Id.* at 437–38.

The Supreme Court's analysis of the FSIA's preemptive effect in *Amerada Hess* applies in this context as well. As the *Amerada Hess* Court observed, Section 1604 provides broadly that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections

1605 to 1607 of this chapter," only "[s]ubject to existing international agreements to which the United States [was] a party at the time of the enactment of this Act." *Id.* at 434 (quoting § 1604). Further, the FSIA specifically provides that "the district courts *shall* have original jurisdiction . . . of *any* nonjury civil action against a foreign state . . . as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity under sections 1606–1607 of this title or under any applicable international agreement." *Id.* (emphases added) (quoting § 1330(a) (as amended by the FSIA)). In light of the express provisions and the "comprehensiveness of the [FSIA's] statutory scheme," *id.* at 437, we view the FSIA Definitional Provision as preempting any alternative grounds for determining sovereign immunity in a civil case brought under the ATA.

Although *Amerada Hess* predated the ATA, the Supreme Court reiterated its holding after the ATA was enacted, in *Altmann*, 541 U.S. at 691. The Court in *Altmann* addressed claims by the niece of a Jewish art collector, who fled Austria in 1938, alleging that the Republic of Austria and the state-owned Austrian Gallery had wrongfully taken possession of six paintings by Gustav Klimt during or after World War II. *Id.* at 680. Her claims arose under Austrian, international, and California law, and she asserted jurisdiction under the FSIA. *Id.* at 685–86. The

Supreme Court explained that Congress enacted the FSIA in 1976 "to remedy the[] problems" of then-prevailing "governing standards [that] were neither clear nor uniformly applied." *Id.* at 691 (internal quotation marks and citation omitted). The result was "the FSIA, a *comprehensive* statute containing a set of legal standards governing claims of immunity in *every* civil action against a foreign state or its political subdivisions, agencies, or instrumentalities." *Id.* (emphasis added) (internal quotation marks and citation omitted). The Court emphasized the language of the FSIA's preamble that it had previously quoted in *Amerada Hess*, stating that the FSIA should be applied "henceforth" to all claims of sovereign immunity in civil actions. *Id.*

*Altmann*, like *Amerada Hess*, unequivocally states that the FSIA comprehensively governs sovereign immunity in civil cases. We acknowledge that neither case involved the ATA, and *Altmann* was decided after its enactment. Indeed, the Supreme Court has recently cautioned that "general language in judicial opinions" should be read "as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering." *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 278 (2023) (internal quotation marks and citation

39

omitted) (warning against applying the language in *Amerada Hess* to criminal cases). Here, however, we remain squarely in the realm of the "circumstances that the Court was . . . then considering"—*i.e.*, jurisdiction over civil, as opposed to criminal, liability. *Id.*

Plaintiffs argue that this reading of the statutes renders the inclusion of "agency" in the ATA Immunity Provision superfluous. To be sure, a construction of a statute that renders language in it redundant is typically "a result . . . to be avoided." *Filler v. Hanvit Bank*, 378 F.3d 213, 220 (2d Cir. 2004). This canon of construction, however, is a general presumption, not an "absolute rule." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013). The presumption against surplusage "assists only where a competing interpretation gives effect to every clause and word of a statute." *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 106 (2011) (internal quotation marks and citation omitted).

Plaintiffs' competing interpretation, however, would have us disregard the FSIA's extensive language describing its general applicability. *See* 28 U.S.C. §§ 1330(a), 1604. It also would require us to read the word "foreign state" in Section 1605B of the FSIA JASTA Amendment—a section that expressly refers to the ATA Immunity Provision—to mean less in Section 1605B than it does in

40

Section 1603.  *Cf. Azar*, 587 U.S. at 574.  Considering the Supreme Court's guidance and our understanding of the text and structure of the statutory scheme, Plaintiffs' reliance on the general presumption against surplusage is insufficient to bear the weight of their argument.

The text, structure, purpose, and history of the FSIA lead us to the same conclusion.  Accordingly, we hold that a "foreign state" for purposes of the ATA Immunity Provision, 18 U.S.C. § 2337(2), is any "foreign state" under the FSIA Definitional Provision, 28 U.S.C. § 1603, which "includes . . . an agency or instrumentality of a foreign state."[11]  Applying that holding, we afford Sberbank, an instrumentality of the Russian Federation due to its majority ownership by the Russian Ministry of Finance, presumptive immunity from suit even where, as here, that suit is brought under the ATA.

---

[11] Only one of our sister circuits has addressed this precise issue regarding the interaction of the FSIA and ATA provisions and it reached the same conclusion that we do today. The First Circuit, in *Ungar*, 402 F.3d at 282, addressed a suit on behalf of victims of a terrorist attack in Israel by members of Hamas.  *Id.* at 275.  In addressing the question of whether the identical term "foreign state" should be read differently between the two statutes, the First Circuit turned to general principles of interpretation, the specific text and history of the FSIA and ATA, and the Supreme Court's guidance in *Amerada Hess* and *Altmann*.  The First Circuit concluded that "an assertion of sovereign immunity under the ATA [is] functionally equivalent to an assertion of sovereign immunity under the FSIA."  *Id.* at 283 (citations to statutes omitted).

41

## D. Application of the FSIA's Commercial Activity Exception to this ATA Action

Our *in pari materia* reading of these provisions is a pyrrhic victory for Sberbank. While Sberbank asks us to rely on the FSIA's status as "the sole basis for obtaining [civil] jurisdiction over a foreign state" to determine whether Sberbank is presumptively immune, Appellant's Br. at 20 (internal quotation marks and citation omitted), it would have us set aside the FSIA's detailed statutory immunity scheme when it comes to applying its exception for commercial activity. We decline to follow Sberbank down this narrow path.

Sberbank makes several arguments contending that the ATA Immunity Provision incorporates the FSIA's definition of "foreign state" but not its commercial activity exception. First, Sberbank argues that Congress has never amended the commercial activity exception under the FSIA to reference the ATA, nor has it included language in the ATA referencing the commercial activity exception. This argument is unpersuasive for the simple reason that a "comprehensive[] . . . statutory scheme" such as the FSIA applies by definition to circumstances within its ambit, regardless of whether it specifically refers to the causes of action that might implicate it. *Amerada Hess*, 488 U.S. at 437. Although the ATA does not reference the FSIA's commercial activity exception, that is

because it does not need to. The "declaration of purpose" Congress enacted in the FSIA's preamble was for future "[c]laims of foreign states to immunity [to] henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter." 28 U.S.C. § 1602; *accord* H.R. Rep. No. 94–1487, at 12 (1976); S. Rep. No. 94–1310, at 11 (1976). Central to this new statutory scheme was the codification of the restrictive theory of sovereign immunity, that is, the doctrine that "states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned." § 1602; *see also Samantar*, 560 U.S. at 313. Making its broad applicability crystal clear, the FSIA expressly states that no foreign state is immune "in any case" where the commercial activity exception applies. § 1605(a). To ensure that courts applied the restrictive theory to all civil claims, regardless of the cause of action, Congress "very likely . . . thought that should be sufficient." *Amerada Hess*, 488 U.S. at 437-38.

Second, Sberbank argues that the FSIA is a general statute governing claims against foreign sovereigns, while the ATA is a specific statute governing claims against foreign sovereigns for acts of international terrorism. Thus, under traditional canons of statutory construction, the ATA's latter-enacted and more

specific sovereign immunity provision displaces the FSIA's general exception to sovereign immunity. Here, however, on the issue of sovereign immunity, we are faced with a "comprehensive statute containing a set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities." *Altmann*, 541 U.S. at 691 (internal quotation marks and citation omitted); *see also Amerada Hess*, 488 U.S. at 439 ("The FSIA provides the *sole* basis for obtaining jurisdiction over a foreign state in federal court." (emphasis added)). We will not set aside that statute's detailed framework and careful balancing of the equities in claims of sovereign immunity based on the argument that the ATA silently repealed that framework, for the same reasons that we decline to find that an instrumentality presumptively immune under the FSIA loses its presumptive immunity when the action is brought under the ATA.

Third, Sberbank relies on the ATA JASTA Amendment, 18 U.S.C. § 2333(d)(2). This amendment provides liability in certain circumstances "for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization." *Id.* Sberbank argues that this inclusion by Congress of an express exception in the ATA, in contrast to the ATA's silence regarding the FSIA's

commercial activity exception, indicates its intent to afford ATA defendants sovereign immunity even for their commercial activity. As Plaintiffs note, though, there is no evidence that in enacting JASTA to expand the rights of terrorism victims, Congress intended to restrict ATA actions. However, this illogical result would follow from holding that the ATA JASTA Amendment evinces Congress's intent to create one, and only one, exception to ATA sovereign immunity. In short, Sberbank's statutory interpretation would run afoul of Congress's stated intent in enacting JASTA, which was "to provide civil litigants with the *broadest possible basis*, consistent with the Constitution of the United States, to seek relief *against persons [and] entities . . . that have provided material support . . .* to foreign organizations or persons that engage in terrorist activities against the United States." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 855 (2d Cir. 2021) (emphases in *Kaplan*) (quoting JASTA, Pub. L. No. 114-222, § 2(b), 130 Stat. at 853 ("Purpose")); *see also Doe v. Bin Laden*, 663 F.3d 64, 68–69 (2d Cir. 2011) (rejecting "Afghanistan's proposed narrow reading" of the noncommercial tort exception, 28 U.S.C. § 1605(a)(5), which Afghanistan argued followed from the state-sponsored-terrorism exception in Section 1605A, because, if the narrow reading were correct, "the enactment of the terrorism exception would therefore have

45

constituted a repudiation of the then-prevailing interpretation of the noncommercial tort exception," which "runs against all canons of interpretation").[12]

In its briefs and at argument, Sberbank further emphasizes the "potential foreign policy friction that may" ensue from reading the ATA together with the FSIA's commercial activity exception. Appellant's Br. at 45. Specifically, it points to the fact that JASTA was enacted over the President's veto. However, that concern provides additional support for not construing JASTA in a manner, as urged by Sberbank, that would stray from Congress's carefully crafted legislative

---

[12] In an attempt to distinguish *Doe*, Sberbank contends that its "position is not that JASTA impliedly repealed the commercial activity exception," but instead "that the commercial activity exception *never applied under the ATA in the first place*." Reply Br. at 20 (emphasis in original). To be sure, before the ATA JASTA Amendment, no court had held that the FSIA's commercial activity exception applied to a case brought under the ATA. However, in this case, that is a distinction without a difference. The crux of Sberbank's argument is the ATA JASTA Amendment. Absent that amendment, there would be little reason to construe the ATA as rejecting the commercial activity exception. Without the amendment, therefore, and interpreting the statutes congruently, as Sberbank's reading requires, the commercial activity exception would apply with equal force to an action brought under the ATA. If the ATA JASTA Amendment is the first indication Congress gave of its intent *not* to extend the commercial activity exception to ATA cases, that argument "would not so much be a reading of the statute as it would be a decision that the [ATA JASTA Amendment] amounts to a partial repeal by implication of the [commercial activity] exception" in the ATA context. *Doe*, 663 F.3d at 68. In any event, we decline to find that the ATA JASTA Amendment constituted an implicit repeal, or rejection, of the application of this exception to foreign sovereign immunity under the ATA.

46

compromises. On the issue before us, Congress has spoken clearly through the FSIA's "comprehensive set of legal standards," which "govern[] claims of immunity in every civil action against a foreign state or its . . . instrumentalities." *Verlinden*, 461 U.S. at 488; *see also Amerada Hess*, 488 U.S. at 437. Congress balanced the relevant policy concerns in the FSIA with awareness of "the potential sensitivity of actions against foreign states," and emphasized "the importance of developing a uniform body of law in this area." *Verlinden*, 461 U.S. at 489 (quoting H.R. Rep. No. 94-1487, at 32). Of those carefully calibrated legal standards Congress adopted in the FSIA, the most notable—the one it specifically selected to explain in the preamble to the statute—is the commercial activity exception. 28 U.S.C. § 1602. We decline to disturb that comprehensive framework absent any specific indication in the text of the FSIA or the ATA that it does not apply in these circumstances.

Accordingly, we conclude that the FSIA's commercial activity exception applies to sovereign immunity under the ATA and, for the reasons outlined *supra* with respect to the FSIA, the alleged conduct by Sberbank that forms the basis of the claims in this suit falls within that exception and similarly abrogates Sberbank's presumptive sovereign immunity under the ATA.

## III.   CONCLUSION

In sum, we hold:

1. Sberbank is presumptively immune under the FSIA.

2. The FSIA's commercial activity exception applies to Sberbank's conduct because the alleged claims are based upon quintessentially commercial activity—facilitating money transfers—that Sberbank carried on in the United States, and thus abrogates Sberbank's sovereign immunity under the FSIA.

3. As a matter of first impression, the ATA's immunity provisions apply not only to agencies, but also to "instrumentalities" of foreign states.

4. As a matter of first impression, the commercial activity exception of the FSIA applies equally to an action brought under the ATA, and thus similarly abrogates Sberbank's sovereign immunity under the ATA.

For the foregoing reasons, we **AFFIRM** the order of the district court and **REMAND** for further proceedings consistent with this opinion.

WALKER, *Circuit Judge*, concurring in part and concurring in the judgment:

I concur in much of the opinion but write separately to register my disagreement as to Part II.C, holding that Sberbank of Russia PJSC ("Sberbank") enjoys presumptive immunity under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 *et seq.*  Though it does not affect the outcome of this appeal, I would instead hold that the ATA immunizes only foreign states and their agencies, not instrumentalities like Sberbank.  The plain text of the ATA's immunity provision makes clear that it was intended to cover a set of entities distinct from those embraced by the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.*  By declining to give effect to these differences, we risk writing into the ATA a new immunity that Congress did not intend and undermining others that it did.

The FSIA immunizes any "foreign state," which it defines as including a "political subdivision of a foreign state or an agency or instrumentality" thereof.  28 U.S.C. § 1603(a).  An "agency or instrumentality" is in turn defined, "for the purposes of [chapter 97]," as "any . . . separate legal person, corporate or otherwise," that "is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof."  28 U.S.C. § 1603(b).  By contrast, the ATA immunizes a narrower set of foreign entities: only a "foreign state" and "an agency" thereof, "or an officer or employee of a foreign state or an agency thereof" acting in their official capacity.  18 U.S.C. § 2337(2).

The ATA does not itself define "foreign state" or "agency of a foreign state." However, "agency" is defined elsewhere in Title 18—which houses the ATA, but not the FSIA—to include "any corporation in which the United States has a proprietary interest."  18 U.S.C. § 6.  By analogy, an "agency of a foreign state" must include any corporation in which a foreign state has a proprietary interest. Sberbank is majority owned by the Russian Ministry of Finance, which is itself an agency of Russia.  Thus, Sberbank cannot constitute a "corporation in which a foreign state has a proprietary interest" but rather one in which *an agency of a*

1

*foreign state* has a proprietary interest. 18 U.S.C. § 6. Sberbank therefore is not an "agency of a foreign state" under the ATA but an instrumentality to which the ATA does not attach immunity. 18 U.S.C. § 2337(2).

If Congress had intended "foreign state" as used in the ATA to incorporate the definitional language found in the FSIA, a law enacted sixteen years earlier and located in a different title of the United States Code, it would have done so explicitly. Contrary to the majority's conclusion, grafting the FSIA's definitional language onto the ATA does in fact come with consequences. *Cf. Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013) (the presumption against surplusage "assists only where a competing interpretation gives effect to every clause and word of a statute" (cleaned up)). It would render superfluous the words "an agency of a foreign state." 18 U.S.C. § 2337(2). More significantly, it could also undermine the ATA's immunity coverage of individual officers and employees of foreign entities. 18 U.S.C. § 2337(2) (extending immunity to "a foreign state, an agency of a foreign state, *or an officer or employee of a foreign state or an agency thereof*" (emphasis added)). The Supreme Court has made clear that, unlike the ATA, the FSIA does *not* immunize individual foreign officials. *Samantar v. Yousuf*, 560 U.S. 305, 319 (2010) ("Reading the FSIA as a whole, there is nothing to suggest we should read 'foreign state' in § 1603(a) to include an official acting on behalf of the foreign state, and much to indicate that this meaning was not what Congress enacted."). The majority's holding, which substitutes the FSIA's language pertaining to immunity reach, could thus have the effect both of extending and reducing the immunity conferred by the ATA. It would grant ATA immunity to instrumentalities and deny it to individual officials of foreign states.

Giving full effect to the textual idiosyncrasies of the ATA could also ease an administrability problem acknowledged by the majority, which this court wrestled with in *Bartlett v. Baasiri*, 81 F.4th 28 (2d Cir. 2023). *Bartlett* held that for the purposes of FSIA immunity, a defendant's status as an instrumentality of a foreign state is measured at the time of a court's decision, not the time of filing. *Id.*

2

at 30. Thus, FSIA immunity "may attach when a defendant becomes an instrumentality of a foreign sovereign after a suit is filed." *Id.* In *Bartlett*, we acknowledged that this rule could lead to "gamesmanship": allowing foreign entities to manufacture immunity by manipulating ownership after a suit is filed. *Id.* at 36. Giving effect to the textual differences between the ATA and FSIA could lessen this perverse incentive. A foreign defendant, like Sberbank here, that is privately owned when a suit is filed but is subsequently acquired by a foreign agency would be entitled to immunity under the FSIA, but not the ATA. And it is more difficult for a nation to transform an entity into an agency than an instrumentality in response to litigation. The former involves an entity's direct absorption into a national government; the latter requires only the turning over of a majority of shares to a pre-existing agency. Excluding instrumentalities from the ambit of ATA immunity could therefore limit the opportunities for this evasive maneuver.

Finally, I cannot agree with the majority that this question is within the realm of circumstances contemplated by the Supreme Court in *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989), or *Republic of Austria v. Altmann*, 541 U.S. 677 (2004). Op. at 40; *see Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 278 (2023) ("general language in judicial opinions" should be read "as referring in context to circumstances similar to the circumstances then before the Court"). First, as the majority points out, neither case concerned the ATA. Although *Altmann* was decided after the ATA was enacted, the great majority of its language reaffirming the FSIA's general applicability comes in the form of direct quotes from *Amerada Hess*, decided before the ATA's time. *Altmann*, 541 U.S. at 691, 699 (quoting *Amerada Hess*, 488 U.S. 434-35, 488). Nothing in *Altmann* indicates that the ATA was even on the Court's radar. Applying general language from those decisions in the ATA context, apart from being countertextual, could lead to the unintended consequences described above.

3

Second, the ATA's idiosyncrasies suggest that it should be treated like the criminal statute in *Turkiye Halk* instead of a run-of-the-mill civil claim over which the FSIA exclusively governs. In *Turkiye Halk,* the Supreme Court made clear that "*Amarada Hess*'s rationale does not translate to the criminal context," because its holding as to the FSIA's "'comprehensiveness'" was limited to civil matters. 598 U.S. at 278 (quoting *Amerada Hess*, 488 U.S. at 437)). The FSIA "says nothing about criminal matters—a distinct legal regime housed in an entirely separate title of the U.S. Code." *Id.* Here, the ATA resembles a similarly distinct regime. Although Plaintiff's ATA claim provides only for civil liability, § 2333 and the ATA in general are intimately bound up with criminal law. The ATA is housed in Title 18 of the U.S. Code, covering federal crimes and criminal procedure. It amended Title 18's section setting forth criminal penalties for acts of terrorism. And civil ATA claims like Plaintiff's are predicated on criminal conduct. *See* Antiterrorism Act of 1990, Pub. L. 101-519, § 132, 104 Stat. 2240, 2250 (1990) (amending 18 U.S.C. § 2332, "Criminal Penalties," which defines "international terrorism" as "activities that . . . are a violation of the criminal laws of the United States . . . or that would be a criminal violation if committed within the jurisdiction of the United States"); Terrorism Civil Remedy, Pub. L. 102-572, Title X, § 1003(a)(4), 106 Stat. 4506, 4522 (1992) (creating a civil claim under 18 U.S.C. § 2333 for an injury arising from "an act of international terrorism"). I therefore disagree that the FSIA's general applicability to civil claims overrides these specific textual differences in the ATA's immunity provision.